*Craig Williams v. State of Maryland*, No. 13, September Term, 2018. Opinion by Greene, J.

**CRIMINAL PROCEDURE – MARYLAND RULE 4-331(a) – MOTION FOR NEW TRIAL**

The Court of Appeals held that the error of supplying the jury with an instruction that was an incorrect statement of law was not harmless. The instruction was on the sole charge, first-degree child abuse, lodged against the Petitioner. We cannot say beyond a reasonable doubt that the error in no way influenced the verdict. Therefore, we reverse and remand the case for a new trial.

Circuit Court for Montgomery County
Case No. 128680C
Argued: October 3, 2018

_____

CRAIG WILLIAMS

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene,
*Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Greene, J.
Watts and Getty, JJ. dissent.

_____

Filed: January 18, 2019

*Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the MD. Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In this case, we consider whether the trial court committed harmless error when it denied the Petitioner's motion for new trial where the trial court gave a pattern jury instruction that erroneously omitted an element of the sole offense for which the petitioner was convicted. On November 21, 2016, a jury in the Circuit Court for Montgomery County convicted Petitioner Craig Williams ("Mr. Williams") of first-degree child abuse. On December 1, 2016, Mr. Williams filed a Motion for New Trial pursuant to Maryland Rule 4-331(a) ("Rule 4-331(a)"). The Circuit Court denied the motion on the grounds that the erroneous jury instruction did not have an impact on the defense's theory of the case. The trial court found that it was not in the interest of justice to grant a new trial. Thereafter, Mr. Williams noted an appeal to the Court of Special Appeals, which affirmed his conviction. The Court of Special Appeals held that "the trial court did not abuse its discretion in determining that the interest of justice did not require granting appellant a new trial." Before us, Mr. Williams seeks a reversal of that judgment on the grounds that the erroneous jury instruction was prejudicial error and warranted a new trial.

### FACTUAL & PROCEDURAL BACKGROUND

*Facts Leading to Charge of First-Degree Child Abuse*

Mr. Williams is the father of I.W., who was born on March 3, 2008 and was eight years old at the time of trial in November 2016. Breana Mapp ("Ms. Mapp") is I.W.'s biological mother. Mr. Williams married Nicole Williams ("Mrs. Williams"), his current wife, after the birth of I.W. Mr. and Mrs. Williams have three sons together. Mr. Williams, in addition to I.W., has another son from a previous relationship. Mrs. Williams has two

children from a previous relationship. Altogether, Mr. and Mrs. Williams have seven children between them. For the first four years of the Williams's marriage, all children except for I.W. lived with them.

In 2012, the Circuit Court for Washington County granted Mr. Williams sole physical and legal custody of I.W. because that court found that Ms. Mapp had sexually and physically abused I.W. Upon moving in with Mr. and Mrs. Williams, I.W.'s behavior showed signs of the sexual trauma and abuse he had suffered at the hands of his mother. For example, I.W. threw tantrums, hit himself and sexually attacked his siblings.[1] Christopher Cofone ("Mr. Cofone"), a social worker, began working with I.W. in May of 2014. Monica Reaves ("Ms. Reaves"), a social worker with Child Protective Services, investigated the report that I.W. had sexually abused his younger half-siblings, but she never considered removing I.W. from the family home.

On November 19, 2015, Mr. Cofone determined that he could no longer help I.W. and recommended that I.W. see a psychiatrist. Although an appointment was scheduled for December 4, 2015, I.W.'s inappropriate behavior continued. According to Mr. Williams, on November 29, 2015, he first wrapped I.W. in plastic at night in an effort to stop I.W. from hurting himself and the other children. The following night, on November 30, 2015, Mr. Williams again wrapped I.W. in plastic wrap from his shoulder to the knee, but also secured I.W.'s hands with zip ties. The following morning I.W.'s wrists were chaffed and by the evening, I.W. had "puffy wrists, was drooling, and was not talking."

---

[1] I.W. would, among other things, insert objects into his rectum to force himself to defecate and then hide the feces throughout the house.

2

Mr. Williams took I.W. to Shady Grove Hospital where I.W. was subsequently transferred to the Children's Hospital within Shady Grove. There, doctors diagnosed I.W. with compartment syndrome[2] and performed surgery on I.W.'s wrists.

*Facts Leading to Motion for New Trial*

On January 7, 2016, the grand jury for Montgomery County indicted Mr. Williams on one count of first-degree child abuse. A conviction of first-degree child abuse requires the State prove beyond a reasonable doubt that Mr. Williams abused I.W. and that the abuse resulted in "severe physical injury." Maryland Code Ann., Criminal Law Article § 3-601(b)(1)(ii) (2002, 2012 Repl. Vol., 2018 Supp.) ("Crim. Law Art."). "Severe physical injury" is a physical injury that:

1. creates a substantial risk of death; or
2. causes permanent or protracted serious:
    A. disfigurement;
    B. loss of the function of any bodily member or organ; or
    C. impairment of the function of any bodily member or organ.

Crim. Law Art. § 3-601(a)(5)(iii). For the jury instructions, at the request of both parties, the trial court instructed the jury using the Maryland Criminal Pattern Jury Instructions ("MPJI-CR"). The MPJI-CR defined "severe physical injury" in pertinent part as:

> [P]hysical injury that (a) causes a substantial risk of death, (b) permanent or protracted serious disfigurement, or (c) causes loss or impairment of a member or organ of the body or its ability to function properly.

---

[2] Dr. Martin explained at trial that muscles, muscle groups, and accompanying nerves, which are surrounded by fascia, collectively constitute a compartment. According to Dr. Martin, compartment syndrome occurs when swelling in the compartment becomes so pronounced "that fascia, that thick covering, doesn't expand and allow for more volume, the muscle can actually collapse on itself due to the pressure and can't receive its appropriate blood flow, the muscles and the nerves."

3

Maryland State Bar Ass'n, *Maryland Criminal Pattern Jury Instructions* 4:07.1, at 472-73 (2016). After the jury found Mr. Williams guilty, Mr. Williams's counsel concluded that the pattern instruction was incorrect because it did not make clear that the terms "permanent or protracted" applied to both loss of function and impairment as well as disfigurement.

This error was confirmed by the Honorable Michael Mason, who was not the presiding judge but at the time served as the Chair of the Maryland State Bar Association's Criminal Subcommittee of the Maryland Pattern Jury Instructions Standing Committee. In an email exchange between Mr. Williams's counsel and Judge Mason, Judge Mason explained that the Criminal Subcommittee remedied the error by changing the pattern instruction on "severe physical injury." *Compare* MPJI-CR 4:07.1, at 472-73 (2d ed. 2017)[3] *with* MPJI-CR 4:07.1 at 472-73 (2d ed. 2016). There is no dispute between the parties that the instruction was erroneous. On December 1, 2016, Mr. Williams filed a motion for new trial and referenced the email exchange between his counsel and Judge Mason. At the close of that hearing, the trial judge denied the motion for new trial.

*Appellate History*

On February 17, 2017, Mr. Williams noted an appeal to the Court of Special Appeals in which he questioned whether the trial court properly exercised its discretion in denying his motion for new trial. On January 23, 2018, the Court of Special Appeals affirmed the trial court decision in an unreported opinion, holding that the trial court did not abuse its

---

[3] "Severe physical injury means: . . . (3) physical injury that (a) creates a substantial risk of death, (b) causes permanent or protracted serious disfigurement, or (c) causes permanent or protracted loss or impairment of the function of any bodily member or organ."

discretion in denying Mr. Williams's motion for new trial. The Court of Special Appeals first cited the broad discretion that is given to trial courts in granting motions for new trial. It then noted that the trial court "reviewed the erroneous instruction in light of the defense's theory of the case and in conjunction with the evidence adduced at trial." The intermediate appellate court, however, failed to apply the appropriate standard of review in this case, and mistakenly declared that the trial court properly weighed all factors in its interest of justice determination.

This Court granted Mr. Williams's petition for writ of certiorari on May 9, 2018. We granted *certiorari* to answer the following question:

> D[id the] circuit court abuse its discretion in denying a motion for new trial where the court gave a pattern jury instruction and, after the jury render[ed] its verdict, the court, prosecution, and defense all acknowledge[d] that the instruction erroneously omitted an element of the offense for which the defendant was convicted?

459 Md. 170, 185 A.3d 63 (2018).

## DISCUSSION

Mr. Williams moved for a new trial under Maryland Rule 4-331(a). This Rule states that the court may, on motion filed by the defendant within ten days after the verdict, order a new trial if it finds that a new trial would be in the interest of justice. Md. Rule 4-331(a). In his motion, Mr. Williams asserted that the faulty jury instruction warranted the granting of a new trial because the instruction with regard to "severe physical injury" was unclear and therefore lowered the standard under which the jury could convict Mr. Williams.

5

Specifically, according to Mr. Williams, the jury instruction did not make clear the definition of "severe physical injury" as defined in Crim. Law Art. § 3-601.

*Standard of Review*

At the outset, we observe that the parties disagree about the appropriate standard of review of the trial judge's denial of the motion for new trial. Petitioner Mr. Williams argues that because the jury had been misled as to the elements of the crime, the Circuit Court's discretion to deny the motion was non-existent. Mr. Williams also cites to *Merritt v. State,* 367 Md. 17, 785 A.2d 756 (2001), and contends that a harmless error standard is appropriate for appellate review. Ultimately, Mr. Williams maintains that under either an abuse of discretion or harmless error standard of review, the Court of Special Appeals and trial court should be reversed. Respondent State of Maryland argues that the standard of review in this case should be abuse of discretion. Respondent concedes that "in all but a very [few] instances, none of which are present here, this Court reviews a trial court's ruling on a Rule 4-331(a) new trial motion for an abuse of discretion."

Respondent's argument that the abuse of discretion standard should apply in this case is primarily based on a claim that this Court's Opinion in *Merritt* is flawed. According to Respondent, *Merritt* is flawed because the Court relied on cases that either had not been queued up by a motion for new trial or did not "review[] the trial court's interest of justice determination." Specifically, Respondent argues that *Merritt*'s references to *Sherman v. State*, 288 Md. 636, 421 A.2d 80 (1980), *Taylor v. State*, 352 Md. 338, 722 A.2d 65 (1998), *State v. Stanley*, 351 Md. 733, 720 A.2d 323 (1998), *Pinkney v. State*, 350 Md. 201, 711 A.2d 205 (1998), and *Ware v. State*, 348 Md. 19, 702 A.2d 699 (1997) are inapposite

6

because the trial court in those cases "either found error when it did not exist or found that no error occurred when it had."

*Abuse of Discretion*

Pursuant to Rule 4-331(a), a trial judge may order a new trial if the court finds it is in the interest of justice to do so. This decision is ordinarily reviewed under the abuse of discretion standard, which this Court made clear in *Buck v. Cam's Broadloom Rugs, Inc.* 328 Md. 51, 57, 612 A.2d 1294, 1297 (1992) ("[A] trial court's order denying a motion for a new trial will be reviewed on appeal if it is claimed that the trial court abused its discretion. However, an appellate court does not generally disturb the exercise of a trial court's discretion in denying a motion for a new trial.") (quoting *Mack v. State*, 300 Md. 583, 600, 479 A.2d 1344 (1984)). Generally, abuse of discretion is the appropriate standard because the decision to grant or deny a motion for new trial under Rule 4-331(a) "depends so heavily upon the unique opportunity the trial judge has to closely observe the entire trial, complete with nuances, inflections, and impressions never to be gained from a cold record[.]" *Buck*, 328 Md. at 59, 612 A.2d at 1298.

The abuse of discretion standard is largely deferential to the trial judge's decision. To reverse the denial of a new trial on appeal, when utilizing the abuse of discretion standard, the reviewing court must find that the "degree of probable prejudice [was] so great that it was an abuse of discretion to deny a new trial." *Merritt*, 367 Md. at 29, 785 A.2d at 763 (quoting *Wernsing v. General Motors Corp.*, 298 Md. 406, 420, 470 A.2d 802, 809 (1984)). "Abuse occurs when a trial judge exercises discretion in an arbitrary or

7

capricious manner or when he or she acts beyond the letter or reason of law." *Campbell v. State*, 373 Md. 637, 666, 821 A.2d 1, 18 (2003) (citation omitted).

*An Exception to the Abuse of Discretion Standard: Merritt v. State*

This Court in *Merritt* made an exception to the general rule that a trial court's decision on a motion for new trial is reviewed for an abuse of discretion. 367 Md. at 30-31, 785 A.2d at 764. *Merritt* explained:

> [W]hen an alleged error is committed during the trial, when the losing party or that party's counsel, without fault, does not discover the alleged error during the trial, and when the issue is then raised by a motion for a new trial, we have reviewed the denial for the new trial motion under a standard of whether the denial was erroneous. . . . Also, in these criminal cases where we concluded that error did occur, the matter of prejudice was reviewed under the harmless error standard of [review].

*Id*. at 31, 785 A.2d at 764-65 (citing *Taylor v. State,* 352 Md. 338, 344, 354, 722 A.2d 65, 68, 72–73 (1998); *State v. Stanley,* 351 Md. 733, 749, 720 A.2d 323, 330–331 (1998); *Pinkney v. State,* 350 Md. 201, 217–218, 711 A.2d 205, 213–214 (1998); *Ware v. State,* 348 Md. 19, 34–35, 54–55, 702 A.2d 699, 706–707, 716 (1997)).[4]

*Merritt* queued up for this Court the question of whether the denial of a motion for new trial can be erroneous given "the fact that prejudicial documentary evidence which was never entered into evidence was erroneously submitted to the jury at the start of its deliberations." 367 Md. at 23, 785 A.2d at 760. In that case, the State discovered two days after the trial ended that an exhibit that had been marked for identification, but had not been admitted into evidence, was present in the jury room during the jury's deliberations. *Id*. at

---

[4] Respondent contends that *Merritt* does not apply in this case because "the trial court assumed the error and considered its effect on the balance of [Mr.] Williams's trial."

8

21-22, 785 A.2d at 759. The exhibit "included the application for the search and seizure warrant for Merritt's home, the warrant, the affidavit in support of the warrant, the inventory return, and a copy of Merritt's taped statement to police[.]" *Id.* The presence of the exhibit in the jury room was the result of the courtroom clerk's "erroneous belief that the exhibit had been admitted into evidence" and was not the fault of either party. *Id.* at 22, 785 A.2d at 759. The trial court denied Merritt's motion for new trial and concluded that there was "overpowering evidence" in the case to convict him. *Id.* at 23, 785 A.2d at 760. We reversed. *Id.* at 35, 785 A.2d at 767.

In analyzing our appellate review of rulings on motions for new trials, we observed that "sometimes a trial court has virtually no discretion to deny a new trial motion[.]" *Id.* at 30, 785 A.2d at 764. *Merritt's* holding recognized the limitation of an abuse of discretion standard, such as in the situation where an error occurred at trial and was not discovered by either party until after the trial, neither party was at fault for not discovering the error, and the error was raised by a motion for new trial. We ultimately concluded in *Merritt* that "the result would be the same whether the denial of the motion for a new trial is reviewed under an abuse of discretion standard or under an error standard." *Id.* at 31-32, 785 A.2d at 765.

Maryland appellate courts have applied the *Merritt* standard in various contexts since 2001. *Nero v. State*, 144 Md. App. 333, 365-66, 798 A.2d 5, 24 (2002) ("[T]he denial of appellant's motion for new trial with respect to the police report should be reviewed under the standard of whether there was error committed and, if so, whether it was harmless error."); *Jenkins v. State*, 375 Md. 284, 299, 825 A.2d 1008, 1017 (2003) ("Thus, the

9

standards of review in *Merritt* and in this case are different.  We will review the trial judge's denial of petitioner's motion for a new trial in the case *sub judice* under an abuse of discretion standard.").  Due to the high burden set by *Merritt*, our appellate courts have generally reviewed the trial court's decision for an abuse of discretion.  *See id.*

*Applying a Harmless Error Standard is Appropriate in the Present Case*

Here, there is no debate that an error, the delivery of the faulty jury instruction, occurred during the trial.  Respondent and Mr. Williams agree that based on the MPJI-CR jury instruction that was given, the jury could convict Mr. Williams of first-degree child abuse as long as he "cause[d] loss or impairment of a member or organ of the body or its ability to function properly."  The instruction did not make clear that the loss or impairment must be either "permanent or protracted serious" as required by Crim. Law Art. § 3-601(b)(1)(ii).  Thus, the trial court committed error when it gave the jury an instruction that effectively lowered Respondent's burden for establishing Mr. William's guilt beyond a reasonable doubt.

Under the harmless error standard of *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976), applied in *Merritt*, we next consider whether the losing party, without fault, did not discover the alleged error during trial.  *See Merritt*, 367 Md. at 31, 785 A.2d at 765.  Here, the erroneous jury instruction was "given at the behest of both parties."  Before us, Mr. Williams argues that he is not at fault because the use of pattern jury instructions is encouraged by this Court.  Additionally, Mr. Williams argues that he was not the only party to rely on the pattern jury instructions.

This Court, in *State v. Brady*, noted that:

10

> [T]he appellate courts of this State have often recognized error in the trial judge's instructions, even when there has been no objection, if the error was likely to unduly influence the jury and thereby deprive the defendant of a fair trial. The premise for such appellate action is that a jury is able to follow the court's instructions when articulated fairly and impartially. It follows, therefore, that when the instructions are lacking in some vital detail or convey some prejudicial or confusing message, however inadvertently, the ability of the jury to discharge its duty of returning a true verdict based on the evidence is impaired.

393 Md. 502, 507, 903 A.2d 870, 873 (2006) (citing *State v. Hutchinson*, 287 Md. 198, 204, 411 A.2d 1035, 1039 (1980)). In *Brady*, Terrell Brady ("Mr. Brady") was charged with attempted murder and the court delivered an erroneous jury instruction on the doctrine of transferred intent. 393 Md. at 504-06, 903 A.2d at 871-73. On direct appeal, Mr. Brady challenged the jury instruction. *Id.* at 506, 903 A.2d at 873. We reversed Mr. Brady's conviction and observed that the "responsibility for avoiding such circumstance rests with the trial judge who must advise the jury on every matter stemming from the evidence which is vital to its determination of the issues before them."[5] *Id.* at 507-08, 903 A.2d at 873. As such, in the present matter, we do not ascribe any fault to either Mr. Williams or Respondent.[6]

---

[5] The Dissenting Opinion suggests that "Maryland Rule 4-325(e) is devoid of any exception that alleviates the responsibility of a defendant's counsel to object where a trial court employs a pattern jury instruction." Yet, the last sentence in Rule 4-325(e) provides that "[a]n appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object." Although plain error is not an issue in this case, *Brady* is significant in its recognition of the court's role in giving proper jury instructions.

[6] The Dissenting Opinion contends that fault for the erroneous jury instruction must be placed with a particular party and that in this case, fault should be attributed to Mr. Williams. We maintain that fault need not be attributed in this case. If we were to assign fault, it should be placed with the trial court because this Court and the Court of Special (continued . . .)

11

The last element of the harmless error review under *Merritt* requires that the issue be raised in writing via a motion for new trial.  Mr. Williams's pleading fulfills this requirement.

*Merritt* provides a guide for when we will review "denials of new trial motions [] under a standard of whether the court erred rather than under an abuse of discretion standard."  367 Md. at 30-31, 785 A.2d at 764.  Three elements must be present: an alleged error occurred during trial that was not discovered during trial, the losing party was without fault for not discovering the error during the trial, and the error is raised in writing.  Here, the three elements are present, and we, thus, review the trial court's denial of Mr. Williams's motion for new trial under the harmless error standard.

Respondent contends that *Merritt* does not apply in this case because "the trial court assumed the error and considered its effect on the balance of Williams's trial[.]"  Alternatively, Respondent suggests that any reliance on *Merritt* would be misguided and argues that the analysis within *Merritt* is flawed.  Respondent points out factual differences between *Merritt* and the cases cited therein[7] to support its proposition that harmless error review is inappropriate in the immediate instance.  Respondent does not adequately explain why these factual differences amount to a flawed inferential step between the standard

---

(. . . continued)
Appeals have been steadfast in encouraging that trial counsel and our trial courts rely on the pattern jury instructions.  *See, e.g., Minger v. State*, 157 Md. App. 157, 161 n. 1, 849 A.2d 1058, 1060 n.1 (2004) ("Appellate courts in Maryland strongly favor the use of pattern jury instructions.").

[7] *Taylor v. State,* 352 Md. 338, 722 A.2d 65 (1998); *State v. Stanley,* 351 Md. 733, 720 A.2d 323 (1998); *Pinkney v. State,* 350 Md. 201, 711 A.2d 205 (1998); *Ware v. State,* 348 Md. 19, 702 A.2d 699 (1997).

applied in *Merritt* and the cases used to support it. We, nevertheless, explore the cases that we relied on in *Merritt*.

In *Taylor*, the defendant, Lisa Taylor ("Ms. Taylor"), was convicted of conspiracy to distribute heroin and possession with intent to distribute. 352 Md. 338, 340, 722 A.2d 65, 66 (1998). The jury raised questions while deliberating and the trial judge answered the questions out of the presence of the defendant, the State, and defense counsel. *Id*. The trial court deemed the error harmless and denied a new trial. *Id*. at 344, 722 A.2d at 73. We reversed and stated that "if the record is silent as to prejudice resulting from a violation of the defendant's right to be present, an appellate court will not 'speculate' as to harm; instead prejudice will be presumed, and the conviction will be reversed." *Id*. at 349, 722 A.2d at 70. Additionally, we stated that "an ambiguous record does not affirmatively show anything and, consequently, cannot support an harmless error argument." *Id*. at 351, 722 A.2d at 71.

In *Stanley*, Larry D. Stanley ("Mr. Stanley"), was convicted of various assault-related crimes. 351 Md. 733, 737, 720 A.2d 323, 324 (1998). During a bench trial, the trial judge asked the State's attorney if she had threatened the witness with perjury charges in order to chill the witness's testimony. *Id*. at 740-41, 720 A.2d at 325-26. The State's Attorney was not a sworn witness at the time of the judge's inquiry. *Id*. Mr. Stanley argued that this was error on the part of the trial judge and warranted a new trial. *Id*. at 740, 720 A.2d at 326. We noted that the State's Attorney not being a sworn witness was irrelevant and therefore a "harmless error" because the trial judge accepted as true the witness's

13

account of her conversation with the State's Attorney. *Id.* at 749, 720 A.2d at 331. The State's Attorney's unsworn statement therefore was not improper, "was a general admonition, not a threat," and did not harm the defendant enough to warrant a new trial. *Id.* at 754, 720 A.2d at 333.

In *Pinkney*, the trial judge erred in finding that the defendant, Eric Pinkney ("Mr. Pinkney"), had waived his right to be present at trial. 350 Md. 201, 205-06, 711 A.2d 205, 207 (1998). We held that there was error in not properly investigating why Mr. Pinkney had failed to appear for trial. *Id.* at 223, 711 A.2d at 216. Additionally, we held that the record must reflect that an adequate inquiry was made to ensure that a defendant's absence was not in fact involuntary. *Id.* We could not presume from a silent record that a waiver had occurred. *Id.* at 217, 711 A.2d at 213.

In *Ware*, the defendant, Darris Ware ("Mr. Ware"), was convicted of first-degree murder. 348 Md. 19, 24, 702 A.2d 699, 701 (1997). During the trial, a witness who was testifying against Mr. Ware had a sentence reconsideration motion pending. *Id.* at 32-33, 702 A.2d at 705. The State did not disclose the pending sentence reconsideration and emphasized in closing that the witness had no reason to lie. *Id.* at 54, 702 A.2d at 716. We held that the potential impact of this non-disclosed information was sufficient to "undermine [the] confidence in the outcome of the proceeding." *Id.*

These four cases all provide an adequate foundation for the rule stated in *Merritt* and which we rely on today. Although Respondent attempts to discredit *Merritt* and its progeny based on procedural differences in the cases, we reject this argument. Our review of error is not causally related to the procedural posture of the trial court's decision. In

14

other words, we review error no differently when the error is presented in a motion pursuant to Rule 4-331(a) than we do in a case involving a direct appeal from a verdict. Although the four cases are procedurally distinct from the instant case, they all involve scenarios in which an error was committed and then determined either to be "harmless" or "prejudicial." We determined that the error in *Merritt* was prejudicial. Likewise, we review the prejudicial effect of the error in the present case. For these reasons, we are neither persuaded that our analysis in *Taylor*, *Stanley*, *Pinkney*, and *Ware* was improper, nor that the analysis in *Merritt* was flawed.

Respondent also argues that *Merritt* is flawed in its reliance on *Sherman v. State*. In *Sherman*, the appellant, Robert Sherman ("Mr. Sherman"), was tried on five counts related to the unlawful and willful use of funds. 288 Md. 636, 637, 421 A.2d 80, 80-81 (1980). Despite the defendant's objection, the jury had before it during deliberations Mr. Sherman's indictment, which included two counts that he had been acquitted of at the close of evidence. *Id.* at 638, 421 A.2d at 81. The State first argued that the issue was not properly preserved for appellate review because only the "count" was referenced in the defense's objection rather than the "indictment." *Id.* at 640, 421 A.2d at 82. This Court determined that the issue was properly before it and that the availability of the indictment in the jury room was reversible error and remanded the case for a new trial. *Id.* at 640, 642, 421 A.2d at 82, 83.

In the present case, Respondent contends that "[t]he problem with the Court's reliance on *Sherman* to apply a harmless error review to the trial court's Rule 4-331(a) ruling, however, is that, in *Sherman*, the Court was not reviewing a trial court's decision

15

on a new trial motion." The Court in *Sherman* was "determining on direct appeal whether the jury's review of a charging document containing 'dead counts' was erroneous in the first instance[.] Consequently, the *Sherman* Court only considered whether the error was harmless." Respondent asserts that *Sherman* is not relevant because it fails to analyze harmless error in the context of a Rule 4-331(a) motion. *Sherman* never reached the interest of justice determination. According to Respondent, therefore, *Merritt*'s reliance on *Sherman* for an interest of justice analysis was flawed. Because Respondent rejects the analysis in *Merritt*, it rejects *Merritt*'s application in the instant case.

Respondent concludes that in the present case, a new trial is not warranted. We disagree. "When we have determined that the trial court erred in a criminal case, 'reversal is required unless the error did not influence the verdict.'" *Porter v. State*, 455 Md. 220, 234, 166 A.3d 1044, 1052 (2017) (quoting *Bellamy v. State*, 403 Md. 308, 333, 941 A.2d 1107 (2008)). In other words, "an error is harmless only if it did not play any role in the jury's verdict." *Id.* at 234, 166 A.3d at 1052 (emphasis omitted). As we do in all cases, where a party has alleged error, we look to see if there was error and inquire into whether the error prejudiced the defendant. If our answer is no, the inquiry ends. If we determine that the error prejudiced the defendant, we analyze how the error prejudiced the defendant. If, as in this case here, we cannot say beyond a reasonable doubt that the error in no way influenced the verdict, we reverse and remand the case for a new trial. In the instant case, Mr. Williams was charged with, and the jury was instructed on, one crime, first-degree child abuse. For this reason, we are not persuaded that the error in the instruction in no way influenced the jury's verdict of first-degree child abuse.

16

Furthermore, in reviewing *Merritt,* we emphasize that "*See*" citations were used for support of the holding in that case. A "*See*" citation indicates that "there is an inferential step between the authority cited and the proposition it supports." THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION R. 1.2(a), at 54 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010). Although not procedurally identical cases, *Merritt* and *Sherman* were factually similar such that an inference was reasonable to support the holding in *Merritt*. Specifically, *Sherman* applied the *Dorsey* standard and the Court was unable to "upon its own independent review of the record, declare beyond a reasonable doubt that the error in no way influenced the verdict." *Sherman*, 288 Md. at 641, 421 A.2d at 82. Whereas, *Merritt* considered whether an error that had occurred at trial was harmless error beyond a reasonable doubt, and, if so, was the error prejudicial. The inference is that review of an error under *Merritt* is no different than review of an error under *Sherman*, *i.e.*, the harmless error standard we applied in *Dorsey*. For the reasons explained herein, we re-affirm *Merritt* and hold that our review of the Circuit Court's denial of the motion for a new trial in this case is subject to the harmless error standard.

## *The* Dorsey *Standard*

Having established that harmless error is the appropriate standard of review of the trial court's denial of Mr. Williams's motion for new trial, we must now determine whether the erroneous jury instruction was prejudicial. *Dorsey* provides the standard for determining whether an error is prejudicial or not:

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing
> court, upon its own independent review of the record, is able to declare a

17

> belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated.

276 Md. 638, 659, 350 A.2d 664, 678 (1976). *Dorsey*, in its analysis of harmless error review, cited to the United States Supreme Court case *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824 (1967). *Id.* at 648, 350 A.2d at 671. In *Chapman*, the prosecutor's argument and trial judge's instruction impressed upon the jury that it may imply guilt on behalf of the petitioners because of the petitioners' failure to testify. 386 U.S. at 18, 87 S. Ct. at 825. The Supreme Court held that the harmless error standard applied and concluded that the error was not harmless. *Id.* at 24, 87 S. Ct. at 828. In that case, the Supreme Court noted that "there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.* at 22, 87 S. Ct. at 827. In other words, *Dorsey* is consistent with *Chapman* in analyzing whether an error is great enough to warrant a new trial, or "so unimportant . . . that [it] be deemed harmless[.]" *Id.*

Respondent argues, much like the trial judge concluded, that because Mr. Williams did not contest the extent of I.W.'s injuries at trial, the instruction did not impact the defense's theory of the case, and the error was, therefore, not prejudicial. Respondent notes that the crux of Mr. Williams's trial strategy was to emphasize Mr. Williams's desire to protect his family. In other words, Respondent asserts that the extent of I.W.'s injuries were ancillary to Mr. Williams's main defense. According to Respondent, it was almost

presumed at trial that I.W.'s injuries were sufficient to be considered "permanent or protracted serious."

The trial judge, in her ruling on the motion for a new trial, stated that "it seems to me that the error . . . did not have a substantial impact on the defense theory in the case in my view." Thus, the trial judge ruled that it was not in the interest of justice to grant Mr. Williams a new trial. In her interest of justice analysis, the trial judge failed to analyze Mr. Williams's defense *in conjunction with* Respondent's burden to prove beyond a reasonable doubt the elements of first-degree child abuse. The interests of justice analysis should not discount Respondent's burden to prove the "permanent or protracted serious" element of first-degree child abuse. In other words, Respondent is not relieved of its burden of proof because of a perceived failure to contest an element of the crime. It is in the lowering of Respondent's burden of proof that Mr. Williams was prejudiced, and that error warrants granting him a new trial.

*Application of the* Dorsey *Standard to the Present Case*

Jury instructions are meant to "direct the jury's attention to the legal principles that apply to the facts of the case." *General v. State*, 367 Md. 475, 485, 789 A.2d 102, 108 (2002). "Accurate jury instructions are also essential for safeguarding a defendant's right to a fair trial. The court's instructions should fairly and adequately protect an accused's rights by covering the controlling issues of the case." *Robertson v. State*, 112 Md. App. 366, 385, 685 A.2d 805, 815 (1996). In the present case, the jury was not properly instructed on the charge of first-degree child abuse.

19

Consistent with the *Dorsey* standard, unless we determine beyond a reasonable doubt that the error in no way influenced the verdict, the error cannot be deemed harmless and a reversal is mandated.[8]  276 Md. at 659, 350 A.2d at 678.  We first point out that the only crime for which Mr. Williams was charged was first-degree child abuse.  As such, it was the only crime on which the jury received instruction.  Respondent argues that this case turns on Mr. Williams's trial strategy—that he did not contest the extent of I.W.'s injuries.  The record, however, suggests otherwise.  The exact nature and extent of I.W.'s injuries were contested at trial during the direct examination of Dr. Martin by Respondent.  During Dr. Martin's direct examination, the following exchanges occurred:

> [RESPONDENT]:  So can you give us an idea – given what happened to [I.W.], he was diagnosed with compartment syndrome?  You have to answer verbally.
>
> [DR. MARTIN]:  Yes.  He had compartment syndrome for sure.
>
> [RESPONDENT]:  Okay.  Can you tell us what some of the long-term effects that you've seen in compartment syndrome?  What happens long term when someone has compartment syndrome in three compartments of the forearms?
>
> [DR. MARTIN]:  I mean, the outcome of a compartment syndrome depends on what the function of the muscles are.  So you can open a compartment

---

[8] The question presented on *certiorari* was:
> Does a circuit court abuse its discretion in denying a motion for new trial where the court gave a pattern jury instruction and, after the jury renders its verdict, the court, prosecution, and defense all acknowledge that the instruction erroneously omitted an element of the offense for which the defendant was convicted?

In contrast, the Dissenting Opinion presents the issue as ". . . whether there is any reasonable doubt that the jury still would have found Williams guilty if the Circuit Court had correctly defined 'severe physical injury.'"  This reframing misstates the issue which, pursuant to *Merritt*, is whether we can, upon independent review of the record, declare beyond a reasonable doubt that the error in no way influenced the verdict.  In the instant case, we are unable to declare that the error was harmless.

20

syndrome, and the person can have completely normal function if it's released in time and all that.

The consequences of compartment syndrome where there's damage to the muscles is usually the muscles get contracted and you're left with a rigid extremity that doesn't work because the muscles no longer function normally. The question is if the nerve was impacted as well. You could have sensory loss as well.

Following this exchange, Mr. Williams's counsel objected as to the foundation of Dr. Martin's testimony. The trial judge sustained the objection and Respondent continued on with its direct examination:

[RESPONDENT]: So let's look at it this way. Based on your review of the records, have you developed an opinion about the functioning of [I.W.]'s hands today?

[DR. MARTIN]: His function is nowhere near normal.

[RESPONDENT]: Okay. Given the fact that his surgery to relieve the pressure associated with compartment syndrome was in December of 2015 and today his function is nowhere near normal, what is his long-term prognosis in your medical opinion?

[DR. MARTIN]: I don't think he's going to make any miraculous recoveries from where he is now. I think that most people – like I said if you get to compartment syndrome early, most people have normal function and you'll see that pretty quickly after their soft tissue wounds heal. So if somebody almost a year later has contracture[, he/she] is going to make very little I think progress from here on out most likely.

\*   \*   \*   \*

I mean if they're working on trying to get a few degrees of motion here and there in his wrist, the chance of ever having a normal function of his arms is highly unlikely.

Again, following this exchange, Mr. Williams's attorney objected to the foundation of Dr. Martin's testimony. The objection was again sustained. Later, on cross-examination, Mr.

21

Williams's counsel questioned Dr. Martin on the possibility of permanency of I.W.'s injuries:

> [WILLIAMS'S COUNSEL]: Are you ruling out the possibility of normalcy?
>
> [DR. MARTIN]: I'd probably say yes.
>
> [WILLIAMS'S COUNSEL]: What do you mean you'd probably say yes?
>
> [DR. MARTIN]: Well, I mean people always hang on to hope, but I don't think he's going to have normal function if he doesn't one year after his injury.
>
> [WILLIAMS'S COUNSEL]: It is true, though, is it not that early intervention, early medical care or treatment of compartment syndrome can lead to – a prompt diagnoses and treatment can lead to a recovery, correct?
>
> [DR. MARTIN]: Correct.
>
> [WILLIAMS'S COUNSEL]: Is it similarly true with Volkmann's Contracture that prompt treatment and diagnosis such as we had here can lead to a recovery?
>
> [DR. MARTIN]: Well, Volkmann's Contracture, once you have that, it's hard – you can't recover from it because it's a consequence of muscle that dies related to compartment syndrome. So basically, Volkmann's Contracture is a complication of compartment syndrome.
>
> [WILLIAMS'S COUNSEL]: But the symptoms of it, you're saying they're incurable?
>
> [DR. MARTIN]: In the sense that you can't create normal function out of it, yes. There are things that you can do to try to maximize someone's function that has Volkmann's Contracture, but to restore normal function is pretty much impossible to do.

The above testimony indicates that early intervention can lead to recovery from compartment syndrome, that normalcy is possible for I.W. but not likely, and that things can be done to maximize someone's function who has Volkmann's Contracture. This testimony indicates that the exact nature and extent of I.W.'s injuries were up for debate

22

by the jury.[9]  The severity of the injuries was not only objected to on direct examination but also contested on cross-examination.  Respondent argues that questioning the foundation of an expert's testimony does not amount to contesting the substance of the expert's testimony.  We disagree.  Because the extent of I.W.'s injuries was a contested element, as the finder of fact, the jury would have had to resolve the issue upon deliberation.

According to the jury instruction that was given, it was unclear if "permanent or protracted serious" applied to both disfigurement *and* loss or impairment of the function of an organ of the body.  The lack of clarity in the instruction clearly prejudiced Mr. Williams and lowered Respondent's burden to establish Mr. Williams's guilt.  The prejudice to Mr. Williams was that Respondent pursued only the charge of first-degree child abuse as opposed to the charges of first and second-degree child abuse.[10]  Upon our review, we

---

[9] During deliberations the trial court received a note from the jury.  The jury requested a transcript of Dr. Martin's in-court testimony.  In response, the trial judge, without obtaining the specifics of their inquiry, directed the jurors to rely upon their collective memory of the doctor's testimony.  This is significant because Dr. Martin's testimony was offered to prove the element that was erroneously instructed on, the "severe physical injury" element of first-degree child abuse.  Accordingly, we will never know the precise impact of the erroneous jury instruction on Dr. Martin's testimony or the ultimate effect on the verdict.  Pursuant to the erroneous jury instruction, the jury *could* have concluded that the loss or impairment of I.W. was *not* "permanent or protracted serious" and still have found Mr. Williams guilty of first-degree child abuse.  In order to be properly convicted of first-degree child abuse, any loss or impairment *must* be "permanent or protracted serious."  Because we are not privy to the specific deliberation of the jury, we cannot say beyond a reasonable doubt that the erroneous instruction had no impact on the jury's verdict.

[10] We note that a second-degree child abuse instruction was not requested by either Respondent or Mr. Williams.  Had a second-degree child abuse instruction been requested and given, and the jury returned a verdict for second-degree child abuse, the error in the first-degree child abuse instruction would have been harmless.  The "permanent or (continued . . .)

23

cannot say that Mr. Williams was not harmed by this error beyond a reasonable doubt. As such, the error cannot be deemed harmless and we reverse the judgments of the Court of Special Appeals and the Circuit Court for Montgomery County.

## CONCLUSION

The trial court erred in denying Mr. Williams's motion for new trial. The error of supplying the jury with an instruction that was an incorrect statement of the law was not harmless, particularly given that Respondent presented the jury with only the charge of first-degree child abuse. We cannot say that the error in the jury instruction in no way influenced the verdict. Therefore, we reverse the judgment of the Court of Special Appeals and direct the remand of the matter to the Circuit Court for a new trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR A NEW TRIAL. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.**

---

(. . . continued)

protracted serious" language is not included in the instruction for second-degree child abuse. The trial judge found it significant that the defense did not seek a second-degree child abuse instruction. Likewise, we note that Respondent also did not seek an instruction on second-degree child abuse.

24

IN THE COURT OF APPEALS

OF MARYLAND

No. 13

September Term, 2018

_____

CRAIG WILLIAMS

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene,
*Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Dissenting Opinion by Watts, J., which Getty,
J., joins.

_____

Filed: January 18, 2019

*Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the MD. Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Respectfully, I dissent. I disagree with the Majority as to both the standard of review and the merits. I would hold that this Court should review the Circuit Court for Montgomery County's denial of the motion for a new trial for abuse of discretion, as opposed to reviewing it for harmless error. Regardless of the standard of review, I would affirm the Court of Special Appeals's judgment. In other words, even assuming for argument's sake that the standard of review is harmless error, I would determine that the record establishes, beyond a reasonable doubt, that the incorrect jury instruction did not affect the verdict.

The Majority correctly observes that an appellate court reviews for harmless error a trial court's denial of a motion for a new trial where "an alleged error occurred during trial that was not discovered during trial, the losing party was without fault for not discovering the error during the trial, and the error is raised in writing." Maj. Slip Op. at 12. In my view, although fault for an erroneous jury instruction will not always be placed on a particular party, the Majority is incorrect in reasoning that Craig Williams, Petitioner, was without fault in not discovering the error in the jury instruction at trial. See id. at 11.

The error in the jury instruction was patent, in that the jury instruction failed to identify all of the elements of first-degree child physical abuse. Specifically, the jury instruction—which defined "severe physical injury" as "physical injury that (a) causes permanent or protracted serious disfigurement or (b) causes loss or impairment of a member or organ of the body or its ability to function properly"—did not accurately reflect Md. Code Ann., Crim. Law (2002, 2012 Repl. Vol.) ("CR") § 3-601(a)(5)(iii)2, which defines "severe physical injury," in pertinent part, as "physical injury that . . . causes

permanent or protracted serious: A. disfigurement; B. loss of the function of any bodily member or organ; or C. impairment of the function of any bodily member or organ." In other words, the jury instruction plainly failed to convey that, under CR § 3-601(a)(5)(iii)2, like disfigurement, loss or impairment of a member or organ of the body or its ability to function properly must be serious and either permanent or protracted. At the time of trial, Williams's counsel was well-aware of CR § 3-601(a)(5)(iii)2's definition of "severe physical injury." Indeed, before jury selection, Williams's counsel expressly cited CR § 3-601(a)(5)(iii)2 while contending that it would be improper for Benjamin Martin, M.D., a medical expert witness for the State, to testify that I.W. suffered permanent or protracted serious disfigurement or impairment of the function of any bodily member or organ, as, according to Williams's counsel, the words "protracted," "severe," and "functioning" are legal terms, not medical terms.

Williams's counsel cannot be absolved of fault for failing to object to the jury instruction just because it was a pattern jury instruction. The record demonstrates that Williams's counsel was well-aware of the elements of first-degree child physical abuse, and would have been aware that the jury instruction did not properly set forth the elements. Maryland Rule 4-325(e) makes clear the need for a defendant's counsel to promptly object to an alleged error in a jury instruction, stating in pertinent part: "No party may assign as error the giving or the failure to give an instruction unless the party objects on the record **promptly after the court instructs the jury,** stating distinctly the matter to which the party objects and the grounds of the objection." (Emphasis added). Maryland Rule 4-325(e) is devoid of any exception that alleviates the responsibility of a defendant's counsel

to object where a trial court employs a pattern jury instruction.

This Court's holding in State v. Brady, 393 Md. 502, 507-08, 903 A.2d 870, 873 (2006) does not support the Majority's determination that Williams's counsel was without fault in not discovering the error in the jury instruction at trial. See Maj. Slip Op. at 11. The Majority quotes part of the following *dicta* in Brady, 393 Md. at 507-08, 903 A.2d at 873:

> [W]hen the [jury] instructions are lacking in some vital detail or convey some prejudicial or confusing message, however inadvertently, the ability of the jury to discharge its duty of returning a true verdict based on the evidence is impaired. The responsibility for avoiding such circumstance rests with the trial judge[,] who must advise the jury on every matter stemming from the evidence [that] is vital to its determination of the issues before them.

(Quoting State v. Hutchinson, 287 Md. 198, 205, 411 A.2d 1035, 1039 (1980)). Maj. Slip Op. at 11. In each of Brady, 393 Md. at 509, 903 A.2d at 874, and Hutchinson, 287 Md. at 202, 411 A.2d at 1037, the issue was whether a trial court committed plain error in failing to correctly instruct the jury. Thus, Brady and Hutchinson are not dispositive where, as here, the question is not whether a trial court committed plain error in failing to correctly instruct the jury; instead, the question is whether a defendant's counsel was without fault in failing to discover an error in a jury instruction at trial.

Immediately after quoting part of the above *dicta* in Brady, 393 Md. at 507-08, 903 A.2d at 873, the Majority states: "As such, in the present matter, we do not ascribe any fault to . . . Williams[.]" Maj. Slip Op. at 11. The Majority implies that, no matter the circumstances, a defendant's counsel is always without fault where he or she fails to discover an error in a jury instruction at trial, as the responsibility for discovering such

- 3 -

errors always rests with the trial court. Such an outcome would be at odds with Maryland Rule 4-325(e)'s recognition that a defendant's counsel bears responsibility for discovering errors in jury instructions and bringing them to the trial court's attention.

Given that Williams's counsel was not without fault in failing to discover the error in the jury instruction at trial, I would review the circuit court's denial of the motion for a new trial for abuse of discretion. As this Court explained in <u>Merritt v. State</u>, 367 Md. 17, 30-31, 785 A.2d 756, 764 (2001), an appellate court reviews a trial court's denial of a motion for a new trial for abuse of discretion, as opposed to reviewing it for harmless error, unless, among other things, "the losing party or that party's counsel, without fault, does not discover the alleged error during the trial[.]" (Citations omitted).

That said, regardless of whether this Court reviews the circuit court's denial of the motion for a new trial for abuse of discretion or for harmless error, the result would be the same—namely, that the circuit court's decision should be affirmed.

Given the terms of the erroneous jury instruction, and given that the jury found Williams guilty of first-degree child physical abuse, the jury necessarily found that Williams caused a physical injury that either: (1) caused permanent or protracted serious disfigurement, or (2) caused loss or impairment of a member or organ of the body or its ability to function properly. The issue that is before this Court is whether there is any reasonable doubt that the jury still would have found Williams guilty if the circuit court had correctly defined "severe physical injury," in pertinent part, as "physical injury that . . . causes permanent or protracted serious . . . loss of the function of any bodily member or organ[] or [] impairment of the function of any bodily member or organ." CR § 3-

601(a)(5)(iii)2B, C.  In other words, the question is: If the circuit court had correctly defined "severe physical injury," would the jury have found that any loss or impairment of a member or organ of the body or its ability to function properly was serious and either permanent or protracted?

From my perspective, an examination of the record demonstrates that, if the proper instruction had been given, the verdict would have been the same.  The evidence demonstrated that, in a misguided attempt to prevent his son I.W. from acting out at night, on multiple occasions, Williams wrapped him with plastic wrap, bound his arms and legs with zip ties, left him that way overnight, and freed him in the morning.  On the last such occasion, Williams wrapped I.W. with plastic wrap so tightly that both of his arms swelled.  Williams was eventually taken to Children's National Medical Center, where Dr. Martin was the orthopedist[1] on call.

Notably, Dr. Martin's testimony unequivocally established that the loss or impairment of a member or organ of I.W.'s body or its ability to function properly was both serious and permanent or protracted.  Dr. Martin testified that he had diagnosed I.W. with compartment syndrome, which occurs when a muscle swells so much that it collapses in on itself, depriving the muscle and nerves of blood flow.  Dr. Martin and another doctor simultaneously performed surgery on both of I.W.'s arms.  After the surgery on I.W.'s arms, a plastic surgeon, Dr. Albert Oh, performed skin grafts.  Dr. Oh diagnosed I.W. with

---

[1]An orthopedist is "a doctor who specializes in the branch of medicine concerned with the correction or prevention of deformities, disorders, or injuries of the skeleton and associated structures[.]"  Orthopedist, Merriam-Webster, https://www.merriam-webster.com/dictionary/orthopedist [https://perma.cc/BS25-2H5J].

Volkmann's Contracture, which, according to Dr. Martin, occurs where compartment syndrome leaves muscles so rigid that they "no longer function normally."

Critically, Dr. Martin testified that I.W.'s hands' functioning was "nowhere near normal[,]" that his prognosis was "poor[,]" and that "the chance of ever having normal function of his arms is highly unlikely." During his cross-examination, Dr. Martin did not retreat from this conclusion. In response to Williams's counsel's questions, Dr. Martin acknowledged that a prompt diagnosis of compartment syndrome and treatment could lead to a recovery, but testified that Volkmann's Contracture cannot be recovered from because it is a complication of compartment syndrome. Williams's counsel then asked whether the symptoms of Volkmann's Contracture were "incurable[.]" Significantly, Dr. Martin responded: "In the sense that you can't create normal function out of it, yes. There are things that you can do to try to maximize someone's function [who] has Volkmann's Contracture, but **to restore normal function is pretty much impossible to do.**" (Emphasis added).

In light of Dr. Martin's unequivocal testimony about I.W.'s symptoms and prognosis, it is clear that the evidence demonstrated, beyond a reasonable doubt, that I.W.'s injuries were serious and either permanent or protracted.

Williams raises a red herring by pointing out that Dr. Martin did not expressly characterize I.W.'s injuries as "serious" or "permanent or protracted." Dr. Martin was not required to use the terms "serious" or "permanent or protracted" to provide ample evidence that I.W.'s injuries were serious and permanent or protracted. Dr. Martin's testimony that I.W.'s hands' functioning was "nowhere near normal" unequivocally established that his

- 6 -

injuries were serious. And Dr. Martin's testimony that "restor[ing] normal function is pretty much impossible to do" clearly showed that I.W.'s injuries were permanent or protracted.

Tellingly, during Williams's opening statement and closing argument, his counsel did not contest the proposition that I.W.'s injuries were serious and permanent or protracted.[2] Instead, Williams's counsel contended that Dr. Martin did not testify that

_____

[2]During William's closing argument, his counsel addressed Dr. Martin, in pertinent part, as follows:

> Dr. Martin is important. Dr. Martin is in the field of pediatric medicine, but I don't get the sense that he's got an abuse training background or something like that. So he seems like a perfectly personable surgeon with experience. But he gives you an opinion about [I.W.]'s current situation. First[,] he never says in an expert opinion way that he thought what little he knew about the events of the night -- remember, he said yes, somebody said something about he was wrapped. He never connected whatever it was he knew about the wrapping with the injuries [that] he was observing. So he didn't give an opinion based on a reasonable degree of medical probability or based on anything else. He didn't even address it.
> But what he does do is he said yes, I did this operation. I did this. I saw [I.W.] maybe -- I don't remember, maybe even as late as December 3lst. Have you ever seen [I.W.] since? No. Well, what are you talking about then? Well, I read a note of [I.W.'s] last visit. But he was in Children's [National Medical Center,] and Dr. Martin didn't see [I.W.] And whoever did see [I.W.] didn't come in here and talk about it. How hard is it? It's proof beyond a reasonable doubt, a critical element of the case. How hard is it to have somebody come in who has just seen [I.W.] and tell you what the situation is instead of a good guy who's saying, well, I haven't seen [I.W.], I read a note from a plastic surgeon -- not an orthopedist -- and so I think it's pretty ugly. [I.W.]'s not going to regain his use.
> How about examining [I.W.]? How about sharing some truth with us about it? Are they hiding something? I don't know. But why aren't they just telling us? I don't see the doctors at Children's [National Medical Center] having any reluctance to come out here and testify in this case. But not so much -- to help you, I'll ask you this -- if Dr. Martin was advising you

(Continued...)

Williams's wrapping of I.W. with plastic wrap caused I.W.'s injuries, and that Dr. Martin had not seen I.W. recently enough as of the time of trial for his opinion about I.W.'s "current situation" to have much weight. Williams's counsel's contentions in no way indicated that, contrary to Dr. Martin's opinion, I.W. would lack full function of his hands for the rest of his life. During closing argument, Williams's counsel indicated that he did not dispute the extent of I.W.'s injuries, stating: "[A]gain, **we're not challenging that the injuries were not very bad. You'd be foolish to do that. They were. They were awful.** But they were unimagined and they were unintended." (Emphasis added).

In sum, at no point during Williams's opening statement or closing argument did his counsel contest that I.W.'s injuries were serious and permanent or protracted. To the contrary, during Williams's opening statement, his counsel stated that he did not "dispute . . . that the injuries have turned out to be what they are." And, during Williams's closing argument, his counsel acknowledged that I.W.'s injuries were "significant, regrettable,

---

about some serious surgery that you were considering, and the best he could say to you was yeah, I remember I saw you about a year ago, and I read a note, and I'm not saying anything about the surgery that's related to what the earlier condition is, but here's what I think. I think you should have the surgery. Would you do it? Would that be enough for you? Do you think you might get a second opinion? Would you might say, doc, could you be a little more specific? That's what we're demanding, is that you don't go back there and go, what the heck happened? Does anybody know what happened between then and then or what does that -- remember, [Dr. Martin]'s an expert because he's a medical doctor. He's an expert because he's got training and studying in this specific field, so he can give an opinion. But just like the doctor who treats you, if you don't like what you're hearing, you don't have to listen to that.

But in a case like this, with so much on the line, with the State bent to punish [] Williams, we want you to look at it, upside down, inside out, in every line.

unimaginable[,]" "very bad[, and] awful."

The Majority is incorrect in determining that Williams's counsel "contested" "the extent of I.W.'s injuries[.]" Id. at 22. The Majority quotes Dr. Martin's cross-examination, see id. at 21, during which Williams's counsel asked Dr. Martin whether he was "ruling out the possibility of normalcy"; whether "a prompt diagnosis and treatment can lead to a recovery" from compartment syndrome; whether "prompt treatment and diagnosis such as we had here can lead to a recovery" from Volkmann's Contracture; and whether "the symptoms of" Volkmann's Contracture are "incurable[.]" I disagree with the Majority's assessment that Dr. Martin's testimony in response to Williams's counsel's questions "indicates that the exact nature and extent of I.W.'s injuries were up for debate by the jury." Maj. Slip Op. at 22-23. To properly find Williams guilty, the jury needed to find that I.W.'s injuries were serious and permanent or protracted. While cross-examining Dr. Martin, Williams's counsel challenged only the idea that I.W.'s injuries would be permanent—*i.e.*, "incurable" or incapable of "recovery"; Williams's counsel in no way contested the evidence that I.W.'s injuries were both serious and protracted.[3] And, as noted above, during Williams's opening statement and closing argument, his counsel made clear that he did not contest the extent of I.W.'s "significant, regrettable, unimaginable[,]" "very bad[, and] awful" injuries.

---

[3]Curiously, the Majority concedes: "[W]e will never know the precise impact of the erroneous jury instruction on Dr. Martin's testimony or the ultimate effect on the verdict." Maj. Slip Op. at 23 n.9. The jury instruction given after Dr. Martin's testimony obviously had no impact on the witness's opinion; and, with this statement, the Majority appears to acknowledge that the instruction may have had no impact on the verdict.

- 9 -

Contrary to the Majority's reasoning, it is appropriate to consider the circumstance that Williams's counsel did not contest that I.W.'s injuries were serious and permanent or protracted.  See Maj. Slip Op. at 19.  The Majority notes that "the State is not relieved of its burden of proof because of a perceived failure to contest an element of the crime."  Id.  Although that statement is accurate, it has no application here.  The issue is not whether the State was relieved of its burden of proof; the issue is whether there is any reasonable doubt that the jury still would have found Williams guilty if the circuit court had correctly defined "severe physical injury."[4]  As discussed above, Dr. Martin's testimony eliminates any such reasonable doubt.

In conclusion, the evidence demonstrates, beyond a reasonable doubt, that I.W.'s injuries were serious and either permanent or protracted, and that the giving of the incorrect pattern jury instruction did not affect the verdict.

For the above reasons, respectfully, I dissent.

Judge Getty has authorized me to state that he joins in this opinion.

---

[4]The Majority frames the question in a similar manner, stating that the issue is "whether we can, upon independent review of the record, declare beyond a reasonable doubt that the error in no way influenced the verdict."  Maj. Slip Op. at 20 n.8.  Contrary to the Majority's determination, in this case, the error was harmless beyond a reasonable and did not influence the jury's verdict.