*State of Maryland v. William Thornton and James Dunbar*, No. 46, September Term, 2025. Opinion by Killough, J.

**CRIMINAL LAW – PLAIN ERROR REVIEW**

The Supreme Court of Maryland determined that the law governing the admission of unqualified toolmark and firearms identification testimony was not "clear or obvious" error at either the time of trial or the time of appeal. This finding is dispositive under plain-error review. *Abruquah v. State*, 483 Md. 637 (2023), is a case-specific *Daubert* determination, not a per se prohibition on unqualified firearms identification testimony.

**CRIMINAL LAW – SIXTH AMENDMENT – RIGHT TO A PUBLIC TRIAL**

The Supreme Court of Maryland determined that, while the courtroom closures were not de minimis under the framework set forth in *Kelly v. State*, 195 Md. App. 403 (2010), a framework this Court now adopts, the closures were ultimately justified under *Waller v. Georgia*, 467 U.S. 39 (1984). The trial court advanced an overriding interest in juror safety and the integrity of deliberations, supported by adequate findings on the record regarding three escalating incidents of spectator misconduct, including direct contact between a co-defendant's father and a sitting juror. The court also considered reasonable alternatives, and its response was no broader than necessary.

Circuit Court for Baltimore City
Case No.: 119343014
Case No.: 119343016
Argued: April 7, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 46

September Term, 2025

_____

STATE OF MARYLAND

v.

WILLIAM THORNTON & JAMES DUNBAR

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Killough, J.
Fader, C.J., Booth, and Biran, JJ., concur and
dissent.

_____

Filed: June 26, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

# I.

This appeal arises out of the convictions of Respondents William Thornton and James Dunbar in the Circuit Court for Baltimore City for offenses arising from the November 2019 murder of Donnell Brockington. Six individuals surrounded the victim and shot him ten to twelve times. The suspects fled in a vehicle, crashed into a tree, and four of them, including Thornton and Dunbar, were apprehended. Police recovered five firearms from the vehicle and one from a co-defendant's person. DNA evidence linked all four co-defendants to the recovered firearms, and the DNA of both Respondents was found on a Desert Eagle 9mm pistol recovered from the front passenger floor of the getaway vehicle. The State's firearms examiner testified at trial that two cartridge casings, one bullet, and two bullet fragments "were fired with" the Desert Eagle. None of the four co-defendants filed a pretrial motion challenging the reliability of that methodology, none requested a hearing under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or its Maryland counterpart, *Rochkind v. Stevenson*, 471 Md. 1 (2020), and none objected when the examiner delivered his unqualified opinion.

During the pendency of Thornton's and Dunbar's appeal, approximately seven months after Respondents' trial, this Court decided *Abruquah v. State*, 483 Md. 637 (2023). Based on the record before us in that case, we held that the methodology of the Association of Firearm and Toolmark Examiners ("AFTE") could support an opinion that ammunition evidence was "consistent with" having been fired from a particular firearm but could not support an unqualified opinion that the ammunitions fired from that specific firearm. *Id.* at 694–95. The Appellate Court of Maryland subsequently reversed Respondents'

convictions on plain-error review, concluding that the firearms examiner's testimony "was exactly the kind of testimony that *Abruquah* prohibits." *Dunbar v. State*, 2025 WL 2027549, *16 (Md. App. Ct. July 21, 2025). The State appealed the Appellate Court's determination to this Court.

Respondent Thornton separately challenges the trial court's decision to close the courtroom during jury deliberations and to permit only family members from each side to attend the return of the verdict, a decision made in response to escalating incidents of spectator misconduct that culminated in a co-defendant's father approaching a juror. The Appellate Court rejected Thornton's public trial claim, finding the closures de minimis.

We granted certiorari to consider two questions, which we rephrased as follows:

1. Did the Appellate Court of Maryland err in reversing Respondents' convictions under plain-error review based on this Court's decision in *Abruquah v. State*, when no defendant challenged the reliability of the firearms identification methodology at trial, no *Daubert-Rochkind* hearing was held, and the law concerning the admissibility of unqualified firearms identification testimony was unsettled at both the time of trial and the time of appeal?

2. Did the trial court violate Respondent Thornton's Sixth Amendment right to a public trial when it closed the courtroom during jury deliberations and partially closed it during the return of the verdict, in response to three escalating incidents of spectator misconduct?

We answer the first question in the affirmative and reverse the intermediate appellate court. The admission of the firearms examiner's unqualified opinion was not "clear or obvious" error at either the time of trial or the time of appeal, which is dispositive under plain-error review. *Abruquah* is a case-specific *Daubert* determination, not a per se prohibition on unqualified firearms identification testimony.

2

With respect to Thornton's argument that his right to a public trial was violated when the trial court partially closed the courtroom, we disagree and affirm the intermediate appellate court. Although we agree that the closures were not de minimis under the framework set forth in *Kelly v. State*, 195 Md. App. 403 (2010), which we adopt today, we conclude that the closures were justified under *Waller v. Georgia*, 467 U.S. 39 (1984). The trial court advanced an overriding interest in juror safety and the integrity of deliberations, supported by adequate findings on the record regarding three escalating incidents of spectator misconduct, including direct contact between a co-defendant's father and a sitting juror. The court also considered reasonable alternatives, and its response was no broader than necessary.

## II.

## FACTS

### A. The Crime and Apprehension

On the evening of November 13, 2019, six individuals surrounded Donnell Brockington in Baltimore City and an undetermined number of them shot him ten to twelve times. Surveillance video captured six men approaching the victim, one of whom was carrying a long gun. All six attempted to flee in a vehicle. A police officer, who had been alerted about the shooting, observed suspicious activity in a vehicle occupied by about six people and decided to follow it. He also requested assistance from the police department's aviation unit. Together, they pursued the vehicle until it crashed into a tree at an intersection. Four of the vehicle's occupants, Respondent William Thornton, Respondent James Dunbar, Shamar Jerry, and Anthony Clark, were apprehended in or near the vehicle.

3

Police recovered five firearms in connection with the apprehension: one handgun on Clark's person and four firearms within the vehicle. The firearms recovered from the vehicle included a Desert Eagle 9mm pistol found on the front passenger floor. DNA evidence linked all four co-defendants to the recovered firearms. Dunbar's DNA was found on three of the recovered guns, including a revolver containing five spent casings and a rifle. DNA from Thornton, Dunbar, and Clark was found on the Desert Eagle.

The State's firearms examiner testified at trial that two cartridge casings, one bullet, and two bullet fragments recovered from the murder scene and from the victim's body during autopsy "were fired with" the Desert Eagle pistol.

**B. The Trial and the Absence of a *Daubert* Challenge**

Thornton, Dunbar, Jerry, and Clark were tried jointly before a jury in the Circuit Court for Baltimore City over a period of approximately three weeks in November and December 2022. The trial occurred against a particular legal backdrop that bears on the issues now before us. Approximately two years before trial, this Court had decided *Rochkind v. Stevenson*, 471 Md. 1 (2020), in which this Court abandoned the *Frye-Reed* general acceptance test for the admissibility of expert testimony in favor of the framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In adopting *Daubert*, we expressly cautioned that the change "may mean, in a very real sense, that 'everything old is new again' with respect to some scientific and technical evidentiary matters long considered settled." *Rochkind*, 471 Md. at 38 (citation omitted).

Approximately six months before Respondents' trial, in June 2022, this Court granted certiorari for a second time in *Abruquah v. State*, 479 Md. 63 (2022), to consider

4

the admissibility of unqualified firearms identification testimony under the new *Daubert-Rochkind* standard. We had previously vacated and remanded in *Abruquah v. State*, 471 Md. 249 (2020), with instructions for the trial court to reconsider the admissibility of the firearms identification evidence in light of *Rochkind*. The pendency of *Abruquah* before this Court was reported in The Daily Record, both at the time certiorari was granted and again when this Court heard oral argument in October 2022, weeks before Respondents' trial began.[1] The grant of certiorari was also officially reported and published on the Supreme Court of Maryland website.[2] *Abruquah v. State*, 479 Md. 63 (2022) (granting certiorari on admissibility of toolmark and firearms identification evidence).

Despite this background, *none* of the four co-defendants filed a pretrial motion under Maryland Rule 4-252 challenging the reliability of the AFTE methodology. *None* requested a *Daubert-Rochkind* hearing. *None* objected when the State's firearms examiner delivered his unqualified opinion that the ammunition evidence "was fired with" the Desert Eagle. (Petitioner's Br. at 5, 7–8). Four attorneys represented four defendants throughout

---

[1] Steve Lash, *Md. High Court to Weigh Ballistics Testimony Under Stricter Standard for Scientific Testimony*, THE DAILY RECORD (June 7, 2022), https://thedailyrecord.com/2022/06/07/md-high-court-to-weigh-ballistics-testimony-under-stricter-standard-for-scientific-testimony/ [https://perma.cc/9DHF-96F6]; Steve Lash, *Md. High Court Weighs Ballistics Testimony Under New Admissibility Standard*, THE DAILY RECORD (October 4, 2022), https://thedailyrecord.com/2022/10/04/md-high-court-weighs-ballistics-testimony-under-new-admissibility-standard/ [https://perma.cc/RY8U-J3P5].

[2] *Petitions for Writ of Certiorari – June, 2022*, SUPREME COURT OF MARYLAND, https://www.mdcourts.gov/scm/petitions/202206petitions [https://perma.cc/2UTW-RUGA] (last visited June 15, 2026).

the proceedings, and not one raised any challenge to the reliability of the firearms identification methodology.

The jury convicted Thornton of first-degree murder, use of a handgun in the commission of a crime of violence, transporting a handgun in a vehicle, possession of an assault pistol, possession of a handgun with a disqualifying conviction, conspiracy to commit murder, and conspiracy to use a handgun in a crime of violence. He was sentenced to an aggregate term of life in prison plus eighteen years.

The jury convicted Dunbar of possessing an assault pistol, possessing a handgun with a disqualifying conviction, and conspiracy to use a handgun in a crime of violence. The jury was unable to reach a verdict on Dunbar's charges for second-degree murder and use of a handgun in the commission of a crime of violence. The State subsequently nol prossed those charges. Dunbar was sentenced to an aggregate term of twenty years' imprisonment.

### C. The Courtroom Closures

Three incidents of escalating spectator misconduct led the trial court to close the courtroom during jury deliberations and to partially close it during the return of the verdict.

The first incident occurred during the trial. The State informed the court that someone had used a cell phone to photograph bench conferences in which the court, the defendants, and counsel appeared. The photographs had been posted on Instagram with the hashtag "free dem boys." The State represented that there were "direct connections between the individuals who own those Instagram accounts and at least one of the defendants." The trial court firmly repeated its previous warning against cellphone use in

6

the courtroom, threatened to confiscate cell phones in the gallery if the conduct recurred, and stated that "I don't expect to hear it again."

The second set of incidents occurred on the eleventh day of trial. The court was informed of "a disturbance between, amongst the families." The court was further informed about an incident outside the courthouse involving "two individuals approached two other individuals who were in this courtroom watching the trial."

The third and most serious incident occurred after closing arguments on the twelfth day of trial. The court received a juror note indicating that co-defendant Clark's father had approached Juror 11 in the hallway. At a bench conference, Juror 11 confirmed that he had been approached by an older man who "just said hi[]" and identified himself as Clark's father. Juror 11 also told the court that he saw Clark's father earlier in the day and recognized him then as a "childhood friend[.]" Other jurors were present when Clark's father approached Juror 11. Juror 12 had written a note on behalf of the Juror 11 and other jurors who witnessed the interaction. At the same bench conference, Juror 12 stated that he heard Mr. Clark's father say, "I'm tired of this shit or something like that" and saw Clark's father shaking hands with Juror 11. Counsel for Dunbar described the incident as "harassing" the juror.

The court individually voir dired each of the twelve jurors at the bench about the incident. Each juror confirmed that he or she could remain fair and impartial. The court then stated:

> I want to be abundantly clear. This is basically the third incident that is disturbing to this Court that has occurred during the course of this trial. . . . [F]or those reasons, I am not . . . comfortable with the public being in this

7

trial or observing it any more. I don't want the jurors to feel that they can not deliberate freely. Every juror has said that they can be fair and impartial, but the Court does not want to impose any (unintelligible). For those reasons, the Court is not going to allow the public back until it's time to hear the verdict.

All four defendants objected to the closure. After hearing argument, the court denied the defendants' motion for mistrial and adhered to its decision to close the courtroom. The court explained:

[W]e have been in this case since November the tenth. Today is December first, so the public has had an opportunity to . . . observe the entire evidentiary portion of the trial. . . . Second, I warned everyone in the gallery that the Court had already had two other instances, and I thought it was abundantly clear that the Court was not going to tolerate any further disruption of this Court's proceedings by way of phone or any other method. Third, an interaction with the juror, the Court sees as the highest form of disruption, and I am not going to take a chance on allowing it to occur any further.

The court considered alternatives. It contemplated excluding only the individual who approached Juror 11 but rejected that option in light of the prior failures of warnings to prevent recurrence. It planned to take the verdict one defendant at a time, which would have allowed more family members in the courtroom for each individual verdict but rejected that option after consulting courtroom security personnel. The court adopted the compromise of full closure during deliberations and partial reopening for the verdict. Immediately after the court decided to fully close the courtroom until the verdict reading, the State acknowledged that it was "aware of who the individual was" that approached Juror 11 and mentioned that "[i]f this individual comes to the State's attention again," the State "may ask" the Sheriff's office to assist "in investigating a contempt of Court charge."

During the closed deliberations, the jury sent six other notes in addition to the note stating that Clark's father had interacted with Juror 11 during the lunch recess. Three were

8

scheduling requests asking when the jurors could leave for the day. One asked about the effect of an undecided verdict on unanimous verdicts. One prompted the court to give an *Allen*-type charge. One announced that the jury had reached verdicts on all charges except two counts against Dunbar. No defendant objected to any of the court's proposed responses to the jury's notes. The *Allen*-type charge was a rereading of Maryland Criminal Pattern Jury Instruction 2:01, the same instruction the jury had received in written form and heard read aloud earlier in open court.

For the reading of the verdict, the trial court partially reopened the courtroom. The court permitted two family members for each of the four defendants and five family members for the victim's family. The court explained that its capacity was "forty-five basically" persons in total, including corrections officers, counsel, and defendants. The court further explained that it remained "concern[ed] for the jury's safety[.]" The court emphasized its concern that families be treated equally: The limitation on family attendance "precludes or foregoes anyone feeling that the Court is treating anybody's family different than the other." Ultimately, the jury convicted Thornton of first-degree murder, use of a handgun in the commission of a crime of violence, transporting a handgun in a vehicle, possession of an assault pistol, possession of a handgun with a disqualifying conviction, conspiracy to commit murder, and conspiracy to use a handgun in a crime of violence. He was sentenced to an aggregate term of life imprisonment plus eighteen years.

### D. Post-Trial and Appellate Proceedings

On December 14, 2022, within the ten-day deadline prescribed by Maryland Rule 4-331(a), Thornton filed a written motion for a new trial. The motion alleged concerns

9

about his right to a public trial, the sufficiency of the evidence to support one of his convictions, and a complaint about the prosecutor's closing argument. The motion did not address the firearms identification testimony.

This Court issued its decision in *Abruquah v. State*, 483 Md. 637 (2023), on June 20, 2023. Nine months after the verdict, at the hearing on his motion for a new trial on October 12, 2023, Thornton's counsel raised *Abruquah* orally for the first time. Counsel argued that the firearms examiner's testimony tying ammunition evidence to the Desert Eagle as "an exact match" had been "placed in question by our highest Court." The prosecutor responded on the merits, arguing that the examiner's opinion was not an unqualified opinion, that *Abruquah* arguably did not extend to shell casings or cartridge cases, or hold that firearms evidence is now unreliable, and that the result would not have changed the verdict in any event. The trial court denied the motion. The court stated that "Counsel is correct regarding his statement of the case law regarding the ballistics evidence." At the same time, the court found that *Abruquah* "had not yet been settled" at the time of trial, that the examiner's testimony could not be considered not qualified, and that the jury could have relied on the DNA evidence linking Thornton to the firearm. Thornton was then sentenced.

On appeal to the Appellate Court, Respondents and co-defendant Jerry collectively raised six claims of error. Both Respondents conceded that the *Abruquah* issue had not been preserved at trial. Both asked the Appellate Court to review the issue for plain error. On the public trial issue, Thornton separately claimed that the closures violated his Sixth Amendment rights.

10

The Appellate Court affirmed on five of the six claims, including Thornton's public trial claim. With respect to the public trial issue, the Appellate Court applied the three-factor framework from *Kelly v. State*, 195 Md. App. 403 (2010), and concluded that both the deliberations closure and the partial verdict closure were de minimis. The Appellate Court reversed the convictions of Thornton and Dunbar on the firearms identification issue. The court held that the examiner's testimony "was exactly the kind of testimony that *Abruquah* prohibits." The court remanded for a new trial.

We granted the State's petition for a writ of certiorari to consider whether the Appellate Court erred in applying plain-error review. We also granted Thornton's cross-petition to consider whether the closures violated his right to a public trial.

### III.

### STANDARD OF REVIEW

Two distinct standards of review govern the two questions before us.

The first concerns plain-error review of an unpreserved evidentiary claim. Both Respondents conceded below that their challenge to the firearms identification testimony was not preserved at trial. Both asked the Appellate Court to review the issue for plain error. Plain-error review is "reserved for errors that are compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *Yates v. State*, 429 Md. 112, 130 (2012) (citation modified). Before an appellate court may exercise its discretion to reverse on this basis, four conditions must be satisfied:

- *First*, there must be an error or defect that has not been intentionally relinquished or abandoned.

11

- *Second*, the legal error must be clear or obvious, rather than subject to reasonable dispute.

- *Third*, the error must have affected the appellant's substantial rights, which ordinarily means that the appellant must demonstrate that the error affected the outcome of the proceedings.

- *Fourth*, the error must seriously affect the fairness, integrity, or public reputation of judicial proceedings.

*Beckwitt v. State*, 477 Md. 398, 464 (2022) (citation omitted). *All* four conditions are mandatory prerequisites; if any of them are not met, plain-error review is unavailable. *Id.*

The first two prerequisites, whether there was an error and whether the error was clear or obvious, present legal questions that we review without deference. *See State v. Wallace*, 372 Md. 137, 144 (2002). The third and fourth prerequisites, and the ultimate decision whether to grant relief, are committed to the discretion of the reviewing court. That discretion has limits. A court abuses its discretion when its decision rests on an error of law. *Rochkind*, 471 Md. at 11. Accordingly, if an appellate court grants plain-error relief based on a mistaken legal conclusion that an error was clear or obvious, the grant of relief cannot stand.

The second standard of review concerns appellate review of a claimed Sixth Amendment violation regarding the court closure. Where, as here, a defendant's constitutional claim was preserved through contemporaneous objection, we make our own independent constitutional appraisal of the record. *Longus v. State*, 416 Md. 433, 457

(2010).  We accept the trial court's findings of fact unless they are clearly erroneous, but we apply the law to those facts independently. *Id.*

**IV.**

**DISCUSSION**

We address the firearms identification issue first because it is dispositive of Respondents' appeal of their convictions.  We then turn to Thornton's public trial cross-petition.

**The Firearms Identification Testimony**

The Appellate Court reversed Respondents' convictions under plain-error review on the ground that the firearms examiner's testimony "was exactly the kind of testimony that *Abruquah* prohibits." *Dunbar v. State*, 2025 WL 2027549, *16 (Md. App. Ct. July 21, 2025).  Both Respondents had conceded that the issue was not preserved below and had asked for plain-error review.  The Appellate Court concluded that the examiner's opinion that the ammunition evidence "was fired with" the Desert Eagle was indistinguishable from the testimony we found inadmissible in *Abruquah* and that the trial court therefore abused its discretion in admitting it. *Id.* at *17.

For the reasons detailed below, we disagree.  Plain-error review requires that the error be "clear or obvious, rather than subject to reasonable dispute[.]" *Beckwitt*, 477 Md. at 464.  The admission of the firearms examiner's testimony was not clear or obvious error at either the time of trial or the time of appeal.  That conclusion is dispositive.  We explain that conclusion in Section A.  We then address, in Section B, the reviewability of unpreserved *Daubert* challenges under plain-error review.  In Section C, we reject

13

Dunbar's alternative theory that the State, as the proponent of the firearms identification evidence, bore the burden of initiating its own *Daubert* hearing. Finally, in Section D, we reject Thornton's separate argument that he is entitled to de novo review of an issue he never raised in writing.

**A. The Error, If Any, Was Not Clear or Obvious**

The second prerequisite to plain-error review requires that the error be "clear or obvious, rather than subject to reasonable dispute[.]" Beckwitt, 477 Md. at 464. "Clear or obvious" means more than that the error is one a careful court might find on close examination. It means that the error is not reasonably debatable. *Id.* (declining to exercise plain-error review where "any error . . . was not clear and obvious but rather is subject to reasonable disagreement"). The admission of the firearms examiner's testimony in this case fails that standard, both with respect to the law as it stood at the time of trial and with respect to the law as it stood at the time of appeal.

*1. The law was unsettled at the time of trial.*

Respondents' trial took place in November and December 2022. By that point, the legal framework governing the admissibility of expert scientific testimony in Maryland had been the subject of significant change, and the admissibility of conclusive firearms identification testimony specifically was the subject of pending appellate review.

In August 2020, approximately two years before this trial, this Court decided *Rochkind v. Stevenson*, 471 Md. 1 (2020). *Rochkind* replaced the longstanding *Frye-Reed* general acceptance test for expert scientific testimony with the more searching framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Rochkind*,

471 Md. at 36. We did not adopt *Daubert* quietly. We expressly cautioned the bench and bar that "[t]he shift to *Daubert* may mean, in a very real sense, that 'everything old is new again' with respect to some scientific and technical evidentiary matters long considered settled." *Id.* at 38 (citations omitted). That cautionary language informed the bench and the bar that the admissibility of expert testimony previously settled under *Frye-Reed*, including testimony from the forensic disciplines, was now open to renewed scrutiny under the *Daubert* framework.

Two additional developments confirmed that firearms identification evidence was specifically among the categories of evidence newly subject to challenge. In October 2020, this Court summarily granted certiorari in *Abruquah v. State*, 471 Md. 249, 250 (2020), vacated, and remanded with instructions for the trial court to reconsider the admissibility of firearms identification evidence in light of *Rochkind*. That decision placed firearms identification evidence on the bench's and bar's radar as an evidentiary matter newly in flux. In June 2022, approximately six months before Respondents' trial began, this Court granted certiorari in *Abruquah* for the second time. *Abruquah v. State*, 479 Md. 63 (2020). The pendency of *Abruquah* before this Court was also published on our website[3] and reported in *The Daily Record*, both at the time certiorari was granted and again when the Court heard oral argument in October 2022, weeks before this trial began.[4]

---

[3] *See Petition for Writ of Certiorari – June, 2022, supra* at 7, n.2

[4] *See Lash, supra* at 7, n.1

15

The Appellate Court reasoned that the law was nevertheless settled at the time of trial because firearms identification testimony had long been admitted under the *Frye-Reed* standard and "was generally accepted" in the relevant scientific community. *Dunbar*, 2025 WL 2027549 at *19; (E. 46). We disagree, for two independent reasons. *First*, even accepting the Appellate Court's premise, its conclusion does not follow. If the law was settled at the time of trial that the testimony was admissible, then the trial court ruled in accordance with settled law, and a ruling consistent with settled law cannot constitute clear or obvious error. *Second*, the premise is wrong. *Frye-Reed* was no longer the law of Maryland. *Rochkind*, 471 Md. at 38. It had been replaced more than two years before this trial, and the law governing the admission of unqualified AFTE testimony under the new standard was not settled in either direction. An error that occurs in an area of law not yet authoritatively resolved is, by definition, subject to reasonable dispute and cannot be "clear or obvious[.]" *Beckwitt*, 477 Md. at 464.

Moreover, there are differing opinions about whether the "clear or obvious" requirement is measured as of the time of trial or the time of appellate review. *Compare Henderson v. United States*, 568 U.S. 266, 273 (2013) (ruling that the error must be plain at the time of review), *with id.* at 285–94 (Scalia, J., dissenting) (concluding that the error must be plain at the time it was committed). We need not resolve that question today. The law governing unqualified firearms identification testimony was unsettled at the time of trial, *supra* at 17-19, and remained unsettled at the time of appeal, *infra* at 19-22. Under any formulation of the temporal inquiry, the Respondents cannot show clear or obvious error.

16

In sum, the unsettled state of the law placed the Respondents on notice that the issue was open. With *Rochkind* providing the governing standard, *Abruquah* pending before this Court, and the issue being publicly debated, Respondents' counsel had every reason and opportunity to file a pretrial *Daubert* motion or, at the very least, to object at the time of the testimony. Four attorneys representing four defendants did neither. Plain-error review is not designed to rescue litigants from strategic choices made when the legal landscape is uncertain.

### 2. The law remained unsettled at the time of appeal; the holding in Abruquah is not a per se rule.

The Appellate Court's analysis treated *Abruquah* as having resolved the question of unqualified firearms identification testimony with categorical clarity. It did not. *Abruquah* was a case-specific *Daubert* determination based on a particular evidentiary record. Several features of our opinion make this plain on its face. We described the scope of our holding in unambiguous terms. We wrote:

> *Based on the evidence presented at the hearings*, we hold that the circuit court did not abuse its discretion in ruling that [the expert witness] could testify about firearms identification generally, his examination of the bullets and bullet fragments found at the crime scene, his comparison of that evidence to bullets known to have been fired from [the defendant's] revolver, and whether the patterns and markings on the crime scene bullets are consistent or inconsistent with the patterns and markings on the known bullets. However, the circuit court should not have permitted the State's expert witness to opine without qualification that the crime scene bullets were fired from [the defendant's] firearm.

*Abruquah*, 483 Md. at 698 (emphasis added). The Court's holding was tied to "the evidence presented at the hearings." *Id.*; *see also id.* at 696 *("[B]ased on the record*

*here*, . . . firearms identification has not been shown to reach reliable results linking a particular unknown bullet to a particular known firearm." (emphasis added)).

We further acknowledged that other studies on the reliability of the AFTE methodology existed but were not before us. We declined to consider them, explaining: "We have not considered those studies in reaching our decision. If any of those studies materially alters the analysis applicable to the reliability of the [AFTE] theory of firearms identification, they will need to be presented in another case." *Id.* at 656 n.6. We further stated that we did "not preclude the possibility that the [analytical] gap may be closed in the future," *id.* at 694, and we acknowledged that different conclusions might be reached by experts "who are asked the right questions or have the benefit of additional studies and data[,]" *id.* at 696.

This language is impossible to square with a *per se* rule. A *per se* rule, by its nature, applies regardless of the underlying record. *Abruquah* by its express terms applies only to a record like the one before us in that case. And where reasonable judges might disagree about whether a categorical rule exists at all, and if so, what it covers, admission of an opinion that falls within the disputed zone cannot be characterized as a clear or obvious error.

Our subsequent disposition of the petition for certiorari in *Harris v. State* confirms this understanding. Pet. Docket No. 338, Sept. Term 2024 (filed Jan. 29, 2025) (unpublished) (Fader, C.J., statement on denial of cert.). In a statement accompanying the denial of certiorari, Chief Justice Fader cautioned that the denial "should not be considered a departure" from the suggestion in *Abruquah* that additional studies presented in a future

18

case might alter our analysis. *Id.* The Chief Justice further explained that it would be "more appropriate to consider certiorari based on a record that is created following our decision in *Abruquah*." *Id.* That statement reflects the same principle: *Abruquah* contemplates case-by-case litigation on developed records, not automatic exclusion regardless of the record.

Even setting aside the express terms of *Abruquah*, the broader landscape of authority confirms that the admissibility of unqualified firearms identification testimony remains the subject of reasonable disagreement. Federal circuits continue to admit this category of testimony under *Daubert*. *See, e.g.*, *United States v. Hunt*, 63 F.4th 1229, 1233 (10th Cir. 2023) (affirming testimony that cartridge cases "were fired from" the same weapon); *United States v. Brown*, 973 F.3d 667, 702, 704 (7th Cir. 2020) (affirming testimony that casings "were fired by the same firearm"); *United States v. Johnson*, 875 F.3d 1265, 1280–81 (9th Cir. 2017) (affirming testimony that bullets "matched . . . to a reasonable degree of ballistics certainty"). Some state courts in *Daubert* jurisdictions have reached similar conclusions. *See, e.g.*, *State v. Mills*, 623 S.W.3d 717, 732 (Mo. Ct. App. 2021) (affirming admissibility of firearm and toolmark identification evidence); *Willie v. State*, 274 So. 3d 934, 939–40 (Miss. 2018) (same); *Garrett v. Commonwealth*, 534 S.W.3d 217, 222–23 (Ky. 2017) (same).

The Respondents' burden under the second prerequisite to plain-error review is to demonstrate that the admission of the firearms examiner's testimony was not reasonably debatable. They have not carried that burden. The Appellate Court's contrary conclusion was an error of law and an abuse of its discretion to grant plain-error review.

## B. The Absence of a *Daubert* Record Below

Beyond the dispositive failure on the second plain-error prerequisite, this case raises a distinct concern about the reviewability of unpreserved *Daubert* challenges. The State urges us to hold that the lack of any request for a *Daubert* hearing renders this issue "functionally unreviewable." We do not embrace that categorical formulation. We have previously rejected an analogous argument that plain-error review is unavailable whenever an unobjected-to error "could have been and probably would have been corrected if called to the trial judge's attention[.]" *State v. Hutchinson*, 287 Md. 198, 203 (1980). We described that approach as "the antithesis of the discretion authorized by the rule." *Id.* The same logic counsels against a categorical bar on plain-error review of unpreserved *Daubert* issues.

That said, *Daubert* determinations present reviewability concerns of a different kind from many other categories of plain-error claims. An erroneous jury instruction can be evaluated on the cold appellate record by comparing the instruction given to the correct legal standard. A *Daubert* admissibility determination cannot be so readily assessed. *Daubert* gatekeeping requires the trial court to weigh scientific studies, assess expert testimony, and make case-specific reliability findings. Under *Daubert*, "the parties and the trial court are forced to reckon with the factors that really do determine whether the evidence is reliable, relevant, and 'fits' the case at issue." *Rochkind*, 471 Md. at 31 (citation omitted). Appellate review of such a determination is "necessarily limited to the information that was before the trial court at the time it made the decision." *Abruquah*, 483 Md. at 656.

20

In this case, no *Daubert* challenge was raised. No hearing was held. No evidentiary record was created. No gatekeeping decision was made. The trial court was never asked to evaluate the reliability of the AFTE methodology, much less to admit or exclude testimony based on that evaluation. There is no ruling to affirm or reverse, no record against which to measure the trial court's exercise of discretion, and no factual foundation from which to conduct the analysis *Daubert* requires.

The Appellate Court imported the evidentiary record from *Abruquah*, which involved a four-day hearing with extensive expert testimony and multiple scientific studies, into a case in which no comparable record exists, and Respondents now ask us to endorse that approach. Federal courts addressing similar situations have warned against precisely this approach. The First Circuit observed that "we can envision few, if any, cases in which an appellate court would venture to superimpose a *Daubert* ruling on a cold, poorly developed record when neither the parties nor the nisi prius court has had a meaningful opportunity to mull the question." *Cortés-Irizarry v. Corporación Insular De Seguros*, 111 F.3d 184, 189 (1st Cir. 1997)*; see also Zimmerman v. Powell*, 684 N.W.2d 1, 13 (Neb. 2004) ("An appellate court is limited to a cold record and thus is not in a position to perform the gatekeeping role in a manner that is fair to the parties."); *C.B. Fleet Co. Inc. v. SmithKline Beecham Consumer Healthcare, L.P.*, 131 F.3d 430, 437 (4th Cir. 1997) (recognizing that *Daubert* application is to be "raised and resolved in the trial court" (citation omitted)).

We need not, and do not, decide the outer boundaries of plain-error review for unpreserved *Daubert* claims. We do not rule out the possibility that a trial record by itself,

21

even without a formal *Daubert* hearing, might contain enough information to permit meaningful appellate review of the reliability of expert testimony. This is not such a case. Four co-defendants represented by four attorneys raised no challenge whatsoever to the firearms identification methodology. The trial record contains no testimony, studies, or argument bearing on the reliability of the AFTE methodology as a general matter. Nothing in the record permits an appellate court to conduct the analysis *Daubert* requires. While that concern does not independently dispose of this case, it reinforces our conclusion that the Appellate Court erred in granting plain-error relief on this record.

### C. The State, as Proponent, Did Not Bear the Burden of Initiating a *Daubert* Hearing

Dunbar offers an alternative theory that does not depend on plain-error review. He contends that the State, as the proponent of the firearms identification evidence, bore the burden of initiating its own *Daubert* hearing to establish the reliability of the testimony, even in the absence of any challenge by the defense. In Dunbar's view, the State's failure to do so constituted preserved error. We reject that argument.

It is well established that, "[w]hen a challenge to the admissibility of expert testimony is raised, 'the burden rests with the proponent . . . to demonstrate that the requirements of Maryland Rule 5-702 have been met.'" *See Oglesby v. Balt. Sch. Assocs.*, 484 Md. 296, 346 (2023) (quoting *Rochkind v. Stevenson*, 454 Md. 277, 286 (2017)). The operative phrase is "[w]hen a challenge . . . is raised[.]" *Ogelsby*, 484 Md. at 346. The burden of establishing admissibility is triggered by an objection or motion. It is not self-executing.

22

Maryland Rule 4-252(d)(3) provides that "[a]ny other defense, objection, or request capable of determination before trial without trial of the general issue, shall be raised by motion filed at any time before trial." *Daubert* challenges fall within this provision, because they ordinarily can be resolved before trial without litigation of the general issue. *See Clemons v. State*, 392 Md. 339, 347 n.6 (2006) (noting that evidence relevant to the admissibility of expert testimony "will usually be collateral to the substantive issues at trial"). The Rule contemplates that the party opposing evidence will put the proponent to its burden by filing a pretrial motion. The trial court's gatekeeping function exists to keep unreliable expert testimony out. The party seeking exclusion is the party with the burden to invoke that function.

If we were to accept Dunbar's position, the consequences would extend far beyond firearms identification testimony. The State would be required to initiate *Daubert* hearings for every expert it intends to call, regardless of whether anyone challenges the expert's testimony. DNA analysts, medical examiners, toxicologists, fingerprint examiners, and every other category of forensic expert would be subject to preemptive reliability hearings in every criminal case. No jurisdiction has adopted such a regime, and we decline to adopt it here. The federal courts of appeals have uniformly placed the burden on the party challenging admissibility to raise a *Daubert* challenge in the trial court. *See, e.g.*, *United States v. Frazier*, 387 F.3d 1244, 1268 n.21 (11th Cir. 2004) (en banc); *Macsenti v. Becker*, 237 F.3d 1223, 1231 (10th Cir. 2001) ("*Daubert* does not mandate an inquiry questioning and challenging the scientific proffer absent a timely request by an objecting party."); *Cortés-Irizarry*, 111 F.3d at 189; *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th

23

Cir. 1996). State courts in *Daubert* jurisdictions have reached the same conclusion. *See, e.g.*, *State v. Sturdivant*, 405 So.3d 756, 762–63 (La. App. 2024); *Woods v. State*, 401 P.3d 962, 972, 974 (Wyo. 2017); *Commonwealth v. Fritz*, 34 N.E.3d 705, 712 (Mass. 2015).

We hold that a party who wishes to challenge the admissibility of expert testimony on reliability grounds must raise that challenge through a proper pretrial motion under Maryland Rule 4-252. Failure to do so forfeits the claim, absent a showing of good cause or unexpected developments at trial that prevented a pretrial challenge. Because no such good cause circumstances exist on this record, and the issue was never raised at any point before or during trial, the challenge is indisputably forfeited here.

### D. Thornton Is Not Entitled to De Novo Review

Thornton offers a separate argument that he is entitled to de novo rather than plain-error review of the firearms identification issue. He bases the argument on the fact that the trial court entertained his *Abruquah* claim on the merits at the hearing on his motion for a new trial in October 2023. Thornton contends that the merits ruling rendered the issue preserved for purposes of appellate review. The argument fails for several independent reasons, any of which would be sufficient to reject this claim.

*First*, the *Abruquah* claim was not raised in Thornton's written motion for a new trial. That motion was filed within the ten-day deadline prescribed by Maryland Rule 4-331(a). It alleged concerns about the right to a public trial, the sufficiency of the evidence, and the prosecutor's closing argument. It said nothing about firearms identification. Thornton raised the *Abruquah* issue orally for the first time at the motion for new trial hearing nine months later, after this Court had decided *Abruquah*. Under *Campbell v.*

24

*State*, 373 Md. 637, 664 (2003), a supplemental motion filed outside the ten-day window alleging "entirely different grounds for relief" is treated as a new and untimely motion. An oral request to add an entirely new ground at a hearing nine months after the verdict is no timelier.

Second, even when a motion for a new trial is timely, the inclusion of an issue in such a motion does not relieve a defendant of the obligation to preserve objections at trial. A motion for a new trial "should not be an opportunity to 'sandbag' an opponent, nor ordinarily to correct oversights that might have been remedied at trial if seasonably noted." *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 62 (1992); *see also Washington v. State*, 191 Md. App. 48, 121 n.22 (2010). To accept Thornton's contrary position would be to permit defendants to preserve any conceivable objection by raising it for the first time after the jury's verdict, an outcome that the Maryland Rules of Procedure foreclose.

Third, Thornton invokes *Williams v. State*, 462 Md. 335, 349 (2019), which permits de novo review of the denial of a motion for a new trial in narrow circumstances. *Williams* requires that an error occur during trial that was not discovered during trial, that the losing party was without fault for not discovering the error, and that the error was raised in writing. *Id.* at 345 (citation omitted). Thornton fails all three requirements. The trial court did not err for the reasons we have already explained. The defense was not without fault: *Rochkind* had been decided two years earlier, certiorari had been granted in *Abruquah* six months before trial, and the issue was being publicly debated. The defense had notice of the unsettled nature of this area of the law, and yet, the claim was never raised in writing at the appropriate time.

25

*Fourth*, Thornton's position in this Court is inconsistent with the position both Respondents took below. Dunbar asked the Appellate Court to "exercise its discretion to recognize plain error." Thornton asked the Appellate Court to "apply the 'plain error' standard to this issue." In this Court, Dunbar has shifted to argue for abuse of discretion review, and Thornton has shifted to argue for de novo review. We decline to hold that Thornton may invoke de novo review on appeal after asking the intermediate appellate court to apply plain error.

*Fifth*, the trial court's ruling at the motion for new trial hearing was a discretionary denial of a new trial motion, not a de novo admissibility determination. The court stated that "Counsel is correct regarding his statement of the case law," but denied the motion because *Abruquah* "had not yet been settled" at the time of trial, the testimony was qualified, and the jury could have relied on the DNA evidence. A discretionary denial of a motion for a new trial is reviewed for abuse of discretion. *Cooley v. State*, 385 Md. 165, 174–75 (2005). It is not subject to de novo appellate review.

Plain-error review is the framework that applies, and as we have explained, Respondents cannot satisfy its requirements.

### The Public Trial Claim

We turn to Thornton's contention that the trial court violated his Sixth Amendment right to a public trial when it closed the courtroom during jury deliberations and partially closed it during the return of the verdict. The Appellate Court rejected this claim, finding both closures de minimis under the framework set forth in *Kelly v. State*, 195 Md. App. 403 (2010). We affirm the judgment of the Appellate Court on this issue but on different

26

reasoning. We adopt the *Kelly* framework as the law of Maryland for evaluating de minimis closures. We conclude that the closures here were not de minimis. We hold, however, that the closures were justified under the four-part test of *Waller v. Georgia*, 467 U.S. 39, 48 (1984), in light of the trial court's legitimate concern for juror safety in response to escalating spectator misconduct.

## A. Framework

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The right is incorporated against the states through the Fourteenth Amendment. *In re Oliver*, 333 U.S. 257, 273 (1948). "The right to an open trial, however, is not absolute." *Longus*, 416 Md. at 446. Other interests, including the maintenance of fairness and orderliness in the proceedings and the protection of the integrity of the judicial system, may permit closure under appropriate circumstances. *Id.* at 447, 454.

The framework for evaluating courtroom closures under the Sixth Amendment derives from the Supreme Court's decision in *Waller v. Georgia*, 467 U.S. 39 (1984). Under *Waller*, a closure is justified only if four conditions are satisfied: (1) "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced"; (2) "the closure must be no broader than necessary to protect that interest"; (3) "the trial court [] consider[s] reasonable alternatives to closing the proceeding"; and (4) the trial court "must make findings adequate to support the closure." *Id.* at 48 (citation omitted). *Waller*'s requirements apply to both total and partial closures. *Longus*, 416 Md. at 452; *see also Watters v. State*, 328 Md. 38, 45 (1992) ("the public may only be

27

constitutionally excluded from a trial . . . pursuant to a narrowly tailored order necessary to protect an overriding state interest.")

This Court has recognized that not every courtroom closure rises to the level of a Sixth Amendment violation. *See Watters*, 328 Md. at 46 (acknowledging that a closure may be "de minimus and undeserving of constitutional protection," though holding the closure in that case constitutionally significant). In *Longus*, we noted that some courts have recognized a de minimis exception for trivial closures. 416 Md. at 459 n.10. The Appellate Court has more fully developed the de minimis framework in *Kelly v. State*, 195 Md. App. 403 (2010), and *Campbell v. State*, 240 Md. App. 428 (2019). Under the *Kelly* framework, a court evaluates whether a closure is de minimis by considering three factors: (1) the duration of the closure; (2) the significance of the proceedings during the closure; and (3) the scope of the closure. *Kelly*, 195 Md. App. at 421–22; *Campbell*, 240 Md. App. at 446.

We adopt the *Kelly* three-factor framework as the law of Maryland for evaluating whether a courtroom closure is so trivial that it does not implicate the Sixth Amendment. The framework appropriately calibrates the constitutional inquiry to the realities of trial practice, in which not every brief or technical limitation on public access can sensibly be treated as a violation of the constitutional right to a public trial. The de minimis inquiry is a threshold question. If a closure is de minimis, the Sixth Amendment is not implicated, and the *Waller* analysis need not be reached.

28

## B. The Closures Were Not De Minimis

Applying the *Kelly* framework, we conclude that the closures in this case, taken together, were not de minimis.

With respect to duration, the total closure during deliberations spanned multiple days. The substantive on-the-record proceedings during the closure were considerably shorter than the full deliberation period and included significant time spent in bench conferences that spectators would not have been able to hear. Even crediting the Appellate Court's estimate of approximately five hours of substantive closed proceedings, the closure here is meaningfully longer than those closures previously deemed de minimis. For example, in *Kelly*, the closure was for two to three hours during voir dire, whereas in this case, the closure spanned several days. *Compare Kelly*, 195 Md. App. at 423 (two to three hours of voir dire), *with* the multi-day closure here.

With respect to significance, while most of the jury notes during deliberations were administrative in character, the giving of a modified *Allen*-type charge is a matter of substantive consequence. *Allen* charges[5] are given when a jury is deadlocked and encourage continued deliberation toward a verdict. *See Kelly v. State*, 270 Md. 139, 143-44 (1973). The giving of such a charge during closed proceedings is more constitutionally significant than the giving of administrative responses to scheduling questions or the

---

[5] The term "*Allen* charge" originates from *Allen v. United States*, 164 U.S. 492 (1896), where the Supreme Court upheld a jury instruction directing a deadlocked jury to reexamine their opinions and attempt to reach a unanimous verdict. This Court has adopted the term "*Allen* charge" to generally remind jurors of their duties in the course of deliberations. *See Kelly v. State*, 270 Md. 139, 142 (1973).

answering of routine jury notes. We acknowledge, as the State observes, that the *Allen* charge given here was a rereading of a pattern instruction the jury had already received in open court and that no party objected to it or proposed an alternative. Those facts may bear on the analysis, but they do not eliminate the constitutional significance of the moment.

With respect to scope, the closure during deliberations was complete. No member of the public was permitted to attend. The closure during the verdict was partial, with eight defense family members and five family members of the victim's family permitted to attend. The capacity of the courtroom, including necessary court personnel, was approximately forty-five, leaving room for only about eleven spectators in any event. As we held in *Longus*, however, the *Waller* standard applies equally to total and partial closures. 416 Md. at 452. The partial nature of the verdict closure is relevant to the de minimis analysis, but it is not dispositive.

Considering these factors together, though giving particular weight to the significance of the *Allen* charge and the complete closure during the period in which it was given, we conclude that the closures were not so trivial that they fall outside the protection of the Sixth Amendment. We therefore proceed to the *Waller* analysis.

## C. The Closures Were Justified Under *Waller*

Although the closures were not de minimis, the trial court's response to the security situation it confronted satisfied each of the four *Waller* requirements. We address them in turn.

### 1. *Overriding interest likely to be prejudiced.*

30

The trial court identified juror safety and the integrity of the deliberative process as the overriding interest justifying the closure. The court's concern was supported by three escalating incidents of spectator misconduct. The first was the photographing of bench conferences in the courtroom, with the photographs posted to social media using a hashtag that, in context, suggested support for the defendants and tied directly to individuals connected with at least one defendant. The second was the disturbance between families and the approach of trial spectators outside the courthouse on the eleventh day of trial. The third was the most serious: the direct approach of a sitting juror by a co-defendant's father, who shook the juror's hand, identified himself, and made an aggressive statement in the presence of other jurors. The trial court characterized this incident as "the highest form of disruption."

We have recognized that interests supporting closure may include "maintaining the fairness and orderliness of the proceeding" and "protecting the integrity of the judicial system." *Longus*, 416 Md. at 447, 454 (citation omitted). The Appellate Court has long held that the right to a public trial "does not require a court to forfeit its legitimate and substantial interest in maintaining security and order in the courtroom." *Walker v. State*, 125 Md. App. 48, 69 (1999). "Courtroom security is an ultimate determination that rests entirely and solely in the discretion of the trial judge[.]" *Cooley*, 385 Md. at 184.

The interest the trial court advanced here was neither speculative nor abstract. The juror approach incident was, in defense counsel's own words, "harassing" the juror. The pattern was escalating; the court had warned the gallery after the first incident, told the gallery that further misconduct would result in cell phone confiscation, and made clear that

31

disruption of the proceedings would not be tolerated. The misconduct nonetheless continued. Three separate incidents in three separate phases of the trial, culminating in direct contact with a sitting juror, established a clear basis for the trial court's concern that further public access during deliberations would prejudice the integrity of the jury's decision-making process. The first *Waller* requirement is satisfied.

### 2. *Closure no broader than necessary.*

The trial court calibrated the closure to the threat. The entire evidentiary phase of the trial, spanning approximately three weeks, was conducted with the courtroom open to the public. The court did not respond to the early misconduct by closing the courtroom. It instead warned the gallery and threatened sanctions for further violations. Only after the third and most serious incident, the direct approach of a sitting juror, did the court close the courtroom, and only for the period of jury deliberations, when juror integrity was most at stake.

For the verdict, the court partially reopened the courtroom. The court permitted family members from both the defense and the victim's family to attend. The court explained that the limit on family attendance reflected the practical capacity of the courtroom, which left room for only about eleven spectators after accounting for necessary personnel. The court further explained that it was treating defense and victim families equally so that no one would feel "that the Court is treating anybody's family different than the other." The closure was narrower in time than the deliberations closure, narrower in scope than complete closure would have been, and tailored to maintain the protection of

32

juror safety while affording the proceedings the meaningful presence of interested observers from both sides.

We acknowledge Thornton's argument that only one of the three incidents took place inside the courtroom itself, and that the others might have been addressed without closing the courtroom at all. The argument has surface appeal. But it misconceives the trial court's concern. The court did not close the courtroom because three incidents took place inside it. The court closed the courtroom because three incidents, taken together, established a pattern of escalating misconduct connected to the parties or their associates that culminated in the direct compromise of juror safety. The geographic location of each individual incident is less important than the cumulative pattern they established. The trial court's response to that pattern was measured, narrower than other available alternatives, and limited in time. The second *Waller* requirement is satisfied.

### 3. Reasonable alternatives.

The trial court considered reasonable alternatives. The court considered excluding only those individuals who had been involved in the prior incidents. It rejected that option after concluding that prior warnings to the gallery had not prevented the escalation of misconduct. The court considered taking the verdict one defendant at a time so that more family members might attend each individual verdict. After consulting with courtroom security personnel, the court concluded that this option presented additional risks. The court then adopted the compromise that has been described: full closure during deliberations, partial reopening for the verdict with equal family representation. The third *Waller* requirement is satisfied.

### 4. *Adequate findings.*

The trial court announced its findings on the record. The court identified the three incidents that supported the closure: the photographing of proceedings, the disturbance between families and approach of spectators outside the courthouse, and the direct approach of a juror by Clark's father. The court explained that the cumulative effect of these incidents was that it was "not . . . comfortable with the public being in this trial or observing it anymore" and that it did not "want the jurors to feel that they cannot deliberate freely." When the court partially reopened for the verdict, it was not "satisfied" that "a conflict will not reoccur" and explained its ongoing "concern for the jury's safety."

The findings were sufficient to permit meaningful appellate review. They identified the specific factual basis for the closure, articulated the interests at stake, and explained the reasoning that supported the chosen response. *Waller* requires findings "specific enough that a reviewing court can determine whether the closure order was properly entered." 467 U.S. at 45 (quoting *Press-Enterprise Co. v. Super. Ct. of Cal.*, 464 U.S. 501, 510 (1984)). The findings here meet that standard.[6]

---

[6] We share the dissent's concern about the gravity of a trial court's decision to close a courtroom, particularly during the delivery of an *Allen* charge. Fader, CJ dissenting at 12. We reach a different conclusion about whether the closure here violated the Sixth Amendment. We do not read the cases construing the public trial right to require a trial judge, faced with repeated disruptions culminating in direct spectator contact with a sitting juror, to await further incidents or to predict which spectator might interfere next. The trial judge identified the precise concern that motivated the closure, the protection of juror independence and deliberative freedom; explained why prior warnings had proven ineffective; and concluded that a temporary closure was necessary to prevent further interference. Those findings were not lengthy, but they were not opaque. They identify the interest at stake, the reason less restrictive measures had failed, and the basis for the court's judgment that closure was warranted. That is what *Waller* requires: findings

34

## D. The Structural Error Argument

Thornton offers an additional argument that the de minimis exception is logically inconsistent with the structural error doctrine that ordinarily attaches to violations of the right to a public trial. Thornton contends that the de minimis inquiry effectively requires a defendant to show prejudice, in the form of harm to the values the public trial right protects, and that this is incompatible with the rule that public trial violations are not subject to harmless error analysis.

We need not resolve that argument today. Because we have concluded that the closures here were not de minimis, the de minimis framework that Thornton challenges does not support the result we reach. We affirm under *Waller*, not under the de minimis exception. *See Waller*, 467 U.S. at 44 (explaining that "the right to an open trial may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial"); *see also Press-Enterprise*, 464 U.S. at 510 ("The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.")

---

specific enough to permit meaningful appellate review. *Waller*, 467 U.S. at 45 (citation omitted). The dissent would require more, but it does not explain what a fuller statement of reasons would have added that the record does not already supply.

We note, however, that the existence of justified closures under *Waller* is not in tension with the structural error doctrine. *Waller* establishes the conditions under which a closure does not violate the Sixth Amendment in the first place. 467 U.S. at 48 (citation omitted). A closure that satisfies *Waller* is not a constitutional violation; the question of structural error therefore does not arise. *Cf. Weaver v. Massachusetts*, 582 U.S. 286, 298 (2017) (acknowledging that the existence of justified closures "suggests that not every public-trial violation results in fundamental unfairness").

The closures here were responses to a genuine and escalating threat to the integrity of the trial. The trial court's response was measured, transparent, and tailored to the threat. The Sixth Amendment does not require a court to maintain unconditional public access in the face of misconduct that compromises the safety of jurors and the integrity of deliberations. We affirm the judgment of the Appellate Court on this issue, although we reach that result through *Waller* rather than through the de minimis framework on which the Appellate Court relied.

## V.

## CONCLUSION

The Appellate Court erred in reversing Respondents' convictions on plain-error review. The admission of the firearms examiner's unqualified opinion that the recovered ammunition "was fired with" the Desert Eagle was not plain error at either the time of trial or the time of appeal. The law was unsettled at the time of trial, and *Abruquah* is a case-specific *Daubert* determination, not a per se rule, the application of which to future cases necessarily turns on the evidentiary record developed in those cases. Where, as here, no

36

*Daubert* challenge was raised below, no hearing was held, and no evidentiary record bearing on the reliability of the methodology was created, the absence of a record reinforces the conclusion that plain-error reversal was inappropriate. We further hold that the State did not bear the burden of initiating its own *Daubert* hearing in the absence of any challenge by the defense, and that Thornton is not entitled to de novo review of an issue he never raised in writing and that he asked the Appellate Court to review for plain error.

The Appellate Court did not err in rejecting Thornton's public trial claim. We adopt the framework set forth in *Kelly v. State* for determining whether a courtroom closure is de minimis. We hold that the closures in this case were not de minimis. We further hold that the closures were nonetheless justified under *Waller v. Georgia*. The trial court advanced an overriding interest in juror safety and the integrity of deliberations, supported by three escalating incidents of spectator misconduct. The court's response was no broader than necessary, considered reasonable alternatives, and was supported by adequate findings on the record.

Because the Appellate Court reversed Respondents' convictions on a basis we now reject, and because it is not clear from the Appellate Court's opinion whether all of Respondents' remaining claims have been resolved, we reverse the judgment of the Appellate Court insofar as it reversed Respondents' convictions and affirm insofar as it rejected the public trial claim. We remand the case to the Appellate Court for that court to address any claims of error raised by Respondents that the Appellate Court did not reach in its original opinion.

37

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED IN PART AND AFFIRMED IN PART. CASE REMANDED TO THE APPELLATE COURT OF MARYLAND FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENTS.**

Circuit Court for Baltimore City
Case No.: 119343014
Case No.: 119343016
Argued: April 7, 2026

IN THE SUPREME COURT

OF MARYLAND

No. 46

September Term, 2025

_____

STATE OF MARYLAND

v.

WILLIAM THORNTON & JAMES DUNBAR

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Concurring and Dissenting Opinion by
Fader, C.J., which Booth and Biran, JJ., join.

_____

Filed: June 26, 2026

I agree that the admission of the firearms examiner's unqualified opinion was not clear or obvious error; that *Kelly v. State*, 195 Md. App. 403 (2010), is an apt framework to analyze whether a closure is trivial; and that the complete closure of the courtroom when the court read the modified *Allen* instruction was not trivial. Accordingly, I join in Parts I, II.A., and II.B., of the discussion section of the Majority opinion. But I disagree with the Majority's application of *Waller v. Georgia*, 467 U.S. 39 (1984). *Waller* requires, among other things, that the closure "be no broader than necessary[,]" and that a trial court "make findings adequate to support the closure." *Id.* at 48. In my view, the court did not make sufficient findings to support the closure and, as a result, I am unable to conclude, on this record, that the complete closure of the courtroom when the modified *Allen* charge was given was appropriate. So, although I agree with the Majority on most of its conclusions, I respectfully dissent from Parts II.C. and II.D. of the discussion section of the Majority opinion.

## I.

"[C]riminal proceedings are presumptively public." *Carter v. State*, 356 Md. 207, 214 (1999). We have recognized, as has the Supreme Court of the United States, that public trials are "for the benefit of the accused[]" and act as a "safeguard against any attempt to employ our courts as instruments of persecution." *Id.* at 215 (quoting *In re Oliver*, 333 U.S. 257, 270-71 (1948)).

The right to a public trial is, of course, not absolute. *Carter*, 356 Md. at 216. But any infringement of that right may be justified "only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve

that interest.  The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."  *Waller*, 467 U.S. at 45 (quoting *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 510 (1984)).  We have articulated the test as:

> The party moving for closure has the burden of proving that "higher values" will be infringed by publicity; that closure of the courtroom will prevent such prejudice; and that reasonable alternatives to closure cannot protect the asserted values.  Where . . . the right asserted in support of closure is a defendant's Sixth Amendment right to a fair trial, a hearing may be closed only if specific findings are made on the record.

*Carter*, 356 Md. at 216-17 (citation modified) (quoting *Baltimore Sun Co. v. Colbert*, 323 Md. 290, 302 (1991)).  In short, exclusion of the public must be "pursuant to a narrowly tailored order necessary to protect an overriding state interest."  *Carter*, 356 Md. at 217 (emphasis omitted) (quoting *Watters v. State*, 328 Md. 38, 45 (1992)).

## II.

In the eyes of the Majority, the trial court "identified juror safety and the integrity of the deliberative process as the overriding interest justifying the closure."  Slip op. at 30.  I agree that both of those interests are critical and, when properly invoked, can justify closure of a courtroom.  But the applicable standard requires the trial court to identify those interests on the record with "findings specific enough" that we "can determine whether the closure order was properly entered."  *Waller*, 467 U.S. at 45 (quoting *Press-Enterprise Co.*, 464 U.S. at 510).  That standard was not met here.

In announcing the courtroom closure, the trial court referred to three different incidents that had occurred during the course of this 15-day trial.

2

First, on the seventh day of trial, the prosecutor informed the court that photographs had been posted to social media depicting bench conferences involving "all of the defendants, the attorneys, and the Court." There is no mention of any photographs depicting any jurors or witnesses. The on-the-record discussion of this incident was:

> [The State]: Your Honor, the State just wants to make the parties and the Court aware that we were made aware today of photographs that were taken yesterday in the courtroom from bench conferences that depict all of the defendants, the attorneys, and the Court. Those photographs were posted on Instagram, and the State is aware of direct connections between the individuals who own those Instagram accounts and at least one of the defendants. We will be looking into filing charges on this. But we want to make the Court and the parties aware of this so that it does not continue.
>
> THE COURT: The Court made an announcement at the outset of this morning session. I intend to be very clear. If I have not. That if I see it, if anyone in this courtroom sees it, anyone [] that works in this courtroom sees it, I'm taking the phone. That's it. And I'm not discussing it. I am very bothered, to say the least, about what the State has just said. And I don't intend to hear about it again. Thank you.
>
> . . .
>
> [Mr. Dunbar's Attorney]: Judge, just to keep the record clear, based on the court proceeding --
>
> THE COURT: I can't hear you.
>
> [Mr. Dunbar's Attorney]: Based on court proceedings, I just maintain a record. Can we approach so the whole courtroom doesn't hear.
>
> THE COURT: Okay.
>
> [Mr. Dunbar's Attorney]: And I'll just say it up here?
>
> THE COURT: All right. Come on up.
>
> . . .

3

(Counsel and the defendants approached the bench and the following occurred:)

[Mr. Jerry's Attorney]: And Your Honor, if I may ask, Madam State, have you seen them?

[The State]: I have seen these photographs[.]

[Mr. Jerry's Attorney]: And what did it show? Us?

[The State]: It shows a photograph of all of us at the bench from yesterday.

[Mr. Jerry's Attorney]: Does it have any captions?

[The State]: I'm not at liberty to say yet. Who it is connected to, I'm investigating it, but I do know it's two handles from Instagram. I know their first names, their last names, their dates of birth. I know who they've communicated with in this courtroom.

Mr. Dunbar's attorney moved for a mistrial. In response, the prosecutor stated:

[The State]: I'll share that the hashtag on the photograph is "free dem boys." That's it. There's no names. No one is tagged in the photograph. If you don't know who we are, you would not be able to tell who is up at the bench. It's the back of our heads.

When making its closure ruling, the court recounted the following description of the

second incident of concern:

The second incident the Court was made aware of was the incident that occurred I believe yesterday between family or family members, I don't know, of the victim or victims. And then the Court also learned the same day two individuals approached two other individuals who were in this courtroom watching the trial.

The court referred to the incident again a few transcript pages later:

The second incident that the Court learned about occurred yesterday. The Court was made aware that there was a disturbance between, amongst the families, and that someone who was watching or observing the trial, was approached by two other people, got out of a Honda and approached them about whatever.

4

Although it is not entirely clear from the transcript, the court appears to have been referring to interactions occurring outside the courthouse, apparently between family of a victim and other unidentified individuals, that were later described to the court by an unidentified source. The court's description of these interactions does not mention jurors or witnesses. There is no mention of any further inquiry or investigation.

Third, after the jury had started deliberations following the close of the evidence, immediately following a lunch break, the court was informed by a juror note that the father of Mr. Clark, one of the defendants, had approached a juror in the courthouse hallway. The court addressed counsel:

> I don't know what happened, but [the] Court received a note saying that someone came up to a juror and said I'm Anthony Clark's father, and "gabbed up," those are their words, the juror. Based on what I saw in the note, first I'm going to let you know, nobody is coming back in the Courtroom except for the verdict. Nobody is coming back in the Courtroom. We will bring the juror out. I don't know who wrote the note, but I will bring out juror number 11 and ask juror number 11, because it looks like an 11 to me. I will bring out juror number 11 to discuss and voir dire them about the note.

The court questioned all the jurors about whether they had seen the interaction and, if they had, whether they could remain fair and impartial. Juror 11 stated that a man who had been a childhood friend of his had approached him in the hallway. In response to the court's request to provide "the entire nature of the interaction[,]" Juror 11 stated: "I walked into the hallway. He walked towards me, and I said what's up, and he said my son is Anthony Clark." Juror 11 said that he had not recognized the man as a childhood friend until that morning, that he would have told the court if he had recognized that connection

5

earlier, and that he had not seen the other man for at least 15 years. Juror 11 told the court that the interaction would not affect his ability to be fair and impartial.

Juror 12, the juror who had sent the note, relayed the following account of the incident:

We are standing near the elevator and juror number 11 was with us. And we were all just waiting for the elevator and then a man who I didn't know [] walked over and said what's up to juror 11. They like, shook hands.

Juror 11 didn't really say anything but the guy said something along the lines of I know, I'm tired of this shit or something like that.

. . .

or something like that that didn't have to do with the case or anything.

. . .

And then he said, I believe what he said was I am An[]thony Clark's father and then kept walking. Juror 11 didn't react at all, so I don't think it mattered but I just know you said to write a note, so.

Juror 9 had witnessed the interaction and described it as: "Someone approached [Juror 11], said their son was Anthony Clark."[1] Jurors 1, 2, 3, 4, 5, 6, 7, 8, and 10 all informed the court that they had not witnessed anything unusual over the lunch break. The

---

[1] The transcript appears to be missing a few lines. The transcript reflects the court asking Juror 9 the question "Did you have any interaction with the individual who had a conversation with juror number 11?" The transcript reflects the following response: "I don't think it would." Juror 9's recorded answer is not responsive to the question that preceded it. Given that the court later stated that "[e]very juror has said that they can be fair and impartial," it appears likely that the transcript is missing at least one response—to the court's question about interactions with Mr. Clark's father—and one question—most likely whether the incident would affect Juror 9's ability to be fair and impartial.

6

court confirmed with Jurors 9, 11, and 12 that the incident would not affect their ability to be fair and impartial.

In making its ruling, the court characterized the incident involving Juror 11 and Mr. Clark's father as "basically the third incident that is disturbing to this Court that has occurred during the course of this trial." After mentioning the other two, the court continued:

> I am not, for those reasons, comfortable with the public being in this trial or observing it any more. I don't want the jurors to feel that they can not deliberate freely. Every juror has said that they can be fair and impartial, but the Court does not want to impose any (unintelligible). For those reasons, the Court is not going to allow the public back until it's time to hear the verdict.

The defendants objected to the closure and alternatively suggested to exclude only the involved individuals in the incidents. The court overruled the defendants' objections and provided three reasons:

> One, we are at the conclusion of the evidence portion of this trial. Therefore, the public for the past -- we have been in this case since November the tenth. Today is December first, so the public has had an opportunity to not only -- to observe the entire evidentiary portion of the trial.
>
> Second, I warned everyone in the gallery that the Court had already had two other instances, and I thought it was abundantly clear that the Court was not going to tolerate any further disruption of this Court's proceedings by way of phone or any other method.
>
> Third, an interaction with the juror, the Court sees as the highest form of disruption, and I am not going to take a chance on allowing it to occur any further. Therefore, the motion for this Court to consider allowing anyone's family or spectators or supporters is denied.

The court added:

7

By not allowing anyone [in the courtroom,] that precludes or foregoes anyone feeling that the Court is treating anybody's family different than the other, that motion is denied.

Leading up to the reading of the modified *Allen* charge, the defendants noted their "continued objection to the closing of the courtroom." The court acknowledged the objections, but did not reconsider its order at that time and did not permit anyone else in the courtroom while it read the modified *Allen* instruction to the jury. The court ultimately made alternative plans for the reading of the verdicts, permitting the victim's family members and two family members for each defendant to sit in the courtroom, over defense objections.

## III.

On this record, the court's explanation of the reasons for closing the courtroom do not satisfy the requirement of "findings specific enough" for us to "determine whether the closure order was properly entered." *Waller*, 467 U.S. at 45 (quoting *Press-Enterprise Co.*, 464 U.S. at 510). Among other things, the court did not explain how the order was "narrowly tailored" "to protect an overriding state interest." *Carter*, 356 Md. at 217 (quoting *Watters*, 328 Md. at 45).

The court referenced three incidents. The first involved taking pictures of bench conferences early in the trial, apparently showing only the backs of the attorneys' and defendants' heads such that they were not identifiable. The court did not link that incident to any concern for the jury or its ability to deliberate freely. Nor was there any apparent

8

link between that incident and either of the others. And there is no suggestion on the record that the conduct continued after the court's contemporaneous admonishment.

The second incident was only vaguely described, and does not appear to have been investigated, but there is no indication that it had anything to do with the courtroom, any of the jurors, or either of the other incidents.

The third incident, while undoubtedly serious, seems to have involved only a single, known individual who had been in attendance for the proceedings. The court conducted an appropriate and thorough investigation of the incident and concluded, without objection from any of the parties, that all of the jurors could remain fair and impartial.

The Majority describes these incidents as "establish[ing] a pattern of escalating misconduct connected to the parties or their associates that culminated in the direct compromise of juror safety." Slip op. at 33. To the Majority, the "geographic location of each individual incident is less important than the cumulative pattern they established." *Id.*

However, no pattern among the three incidents is apparent from the record and the trial court did not identify one. This is not a case in which we are free to assume that a valid reason exists that is not apparent from the record. Here, due to the sanctity of the Sixth Amendment right to a public trial implicated by courtroom closures, the United States Supreme Court and our own precedent require specific findings reflecting the reason for the closure. *See Waller*, 467 U.S. at 45; *Carter*, 356 Md. at 216-17 That precedent also requires consideration of possible alternatives, with findings that are "sufficient to permit

9

meaningful appellate review." Slip op. at 34; *see also Waller*, 467 U.S. at 45; *Carter*, 356 Md. at 216-17.

The only alternative to closure that the record reflects the court considering is the defendants' suggestion that the court exclude from the courtroom only Mr. Clark's father, who had approached Juror 11, or to at least allow other family members to remain in the courtroom. The court's three stated justifications for rejecting that were that the courtroom had been open to that point, that the court had warned everyone in the gallery that it would not tolerate further disruptions "by way of phone or any other method[,]" and that the interaction with the juror constituted "the highest form of disruption, and I am not going to take a chance on allowing it to occur any further." As to the first two justifications, having the courtroom open for most critical moments of a trial is no justification for closing it during other critical moments, and the court's warning appeared to have been entirely successful, as the record does not reflect any further, similar incidents in the courtroom.

With respect to the final justification, the court did not explain how the egregious act of one parent of one defendant interacting with a juror outside the courtroom posed any risk of improper conduct by other family members or members of the public within the courtroom. Other than the pictures that had been taken earlier in the trial, which apparently did not include any jurors, the incidents referenced by the court do not reflect improper conduct in the courtroom by anyone throughout the 15-day trial.

Preventing juror tampering and ensuring free deliberations are, without a doubt, state interests of the highest order. But on this record, the court did not make specific

10

findings or explain why its complete closure of the courtroom during jury deliberations, and especially while giving the modified *Allen* charge, was narrowly tailored to advancing those interests.[2] Under *Waller* and *Carter*, the court was required to do so. *See, e.g.*, *Carter*, 356 Md. at 219-20 (reversing a conviction where the trial court closed the courtroom during the testimony of a child victim without holding a hearing, taking testimony concerning the necessity of a closure, or making specific findings of fact on the record demonstrating a sufficient basis for closure); *Holt v. State*, 129 Md. App. 194, 207-08 (1999) (reversing a conviction where the trial court closed the courtroom during the testimony of a witness in protective custody in the absence of findings to justify the closure); *People v. Reid*, 218 N.E.3d 684, 685-86, 687 (N.Y. 2023) (reversing judgment for improper closure of a courtroom where the trial court did not "sufficiently" consider whether "less drastic measures could have resolved troubling spectator behavior," including identifying and "exclud[ing] only [particular offenders] from the courtroom[]"); *id.* at 203 (stating that "it is incumbent on the trial court to ensure that the record adequately justifies its concerns and demonstrates that the identified interest would be jeopardized absent a closure[]" and "[w]here closure is warranted, it must be tailored to address the overriding interest[]").

As the Supreme Court highlighted in *Waller*, "the right to an open trial may give way in certain cases to other rights or interests," but "[s]uch circumstances will be rare[]"

---

[2] As the Majority concludes, and I agree, providing a modified *Allen* charge is a constitutionally significant moment in a trial. Slip op. at 29-30.

and "the balance of interests must be struck with special care." 467 U.S. at 45. Accordingly, before closing a courtroom, a trial court must make findings on the record that are sufficient to permit a reviewing court to determine whether the closure was justified, which is to say that the closure served an overriding state interest, that it was narrowly tailored, and that narrower options were considered and found insufficient. Without adequate findings, a reviewing court cannot "determine whether the closure order was properly entered." *Id.* (quoting *Press-Enterprise*, 464 U.S. at 510).

As the Majority recognizes, and I agree, "maintaining the fairness and orderliness of the proceeding," *Longus v. State*, 416 Md. 433, 447 (2010) (quoting *Butler v. Smith*, 416 F. Supp. 1151, 1154 (S.D.N.Y. 1976)), and "protecting the integrity of judicial proceedings," *Longus*, 416 Md. at 454, are important interests , and "courtroom security is an ultimate determination that rests entirely and solely in the discretion of the trial judge," *Cooley v. State*, 385 Md. 165, 184 (2005). But because of the significant Sixth Amendment interests that are implicated by the closure of a courtroom, a trial court should do so only when circumstances necessitate it. And when that occurs, "it is incumbent on the court to ensure that the record adequately supports excluding members of the public." *Reid*, 218 N.E.3d at 688.

The record before us does not demonstrate that circumstances necessitated complete closure of the courtroom. It is possible that there was more that concerned the court than is apparent from the record. It is possible that there was a link among the three incidents that the trial court was aware of that is not apparent from the record. And it is possible that

12

the trial court weighed other alternatives to closure silently and determined that they would not be adequate for reasons that are not apparent from the record. But none of that is before us. *Waller* and *Carter* require more. Accordingly, I respectfully dissent from Parts II.C. and II.D. of the discussion section of the Majority opinion.

Justice Booth and Justice Biran advise that they join in this concurring and dissenting opinion.